Grocery Manufacturers of America, Inc. *v.* Department of Public Health.

GROCERY MANUFACTURERS OF AMERICA, INC. & others[1]
*vs.* DEPARTMENT OF PUBLIC HEALTH & another.[2]

Suffolk.   May 8, 1979. — August 28, 1979.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Food.   Administrative Law*, Agency, Rulemaking. *Regulation.   Department of Public Health.   Constitutional Law*, Interstate commerce, Federal preemption, Regulation. *Due Process of Law*, Vagueness of regulation.

The Department of Public Health had authority under G. L. c. 94, § 192, to adopt a regulation to require persons who offer a food product for sale in package form to disclose a date on the package to provide the consumer with information about the quality of the product as it may be adversely affected by the passage of time. [74-77]

In an action under G. L. c. 231A challenging the validity of a food labeling regulation adopted by the Department of Public Health, there was no merit to the plaintiffs' contention that the regulation was invalid because the department failed to conform with various procedural

---

[1] The Grocery Manufacturers of America, Inc., is an incorporated trade association whose membership includes approximately 145 companies. The other plaintiffs are the American Frozen Food Institute, an incorporated trade association, whose membership includes 409 companies, and the following corporations engaged in the manufacture of labeled food products: Consolidated Foods Corporation, ITT Continental Baking Company, Nabisco, Inc., Ore-Ida Foods, Inc., The Pillsbury Company, The Quaker Oats Company, Seabrook Foods, Inc., Sioux Honey Association, Standard Brands Incorporated, and Stouffer Foods Corporation.

[2] The interim Commissioner of the Department of Public Health.

requirements in adopting the regulation; neither the eighteen-month delay between the date of the public hearing and the date of adoption of the regulation nor the changes made in the regulation during that period created a procedural infirmity, nor was the department required to include in the record a statement of the legislative facts supporting the regulation. [77-80]

A regulation promulgated by the Department of Public Health, which required "open date labeling" of food products, did not impose an impermissible burden on interstate commerce. [80-81]

A regulation promulgated by the Department of Public Health, which required "open date labeling" of food products, did not intrude on an area preempted by Federal law. [81-82]

A regulation promulgated by the Department of Public Health, which required "open date labeling" of food products, was not unconstitutionally vague and did not lack a reasonable relation to public health and safety. [82-85]

BILL IN EQUITY filed in the Supreme Judicial Court for the county of Suffolk on September 13, 1973.

The case was reported by *Abrams, J.*

*John J. Curtin, Jr.* (*Irvin D. Gordon & Janis M. Berry* with him) for the plaintiffs.

*S. Stephen Rosenfeld,* Assistant Attorney General (*Terry Jean Seligmann & Robert Gaines,* Assistant Attorneys General, with him) for the defendants.

WILKINS, J. The plaintiffs, who shall be referred to collectively as the GMA (Grocery Manufacturers of America, Inc.), brought this action under G. L. c. 231A, to challenge the validity of a food labeling regulation adopted in July, 1978, by the Department of Public Health (department). A single justice reported the case to the full court on the pleadings and a statement of agreed facts.

The challenged regulation appears in § 101.19 of the Massachusetts Register under the heading "FOOD, OPEN DATE LABELING" and is set forth in an appendix to this opinion. The basic purpose of the regulation is to require persons who offer a food product for sale in package form to disclose a date on the package to provide the consumer with information about the quality of the product as it may be adversely affected by the passage of time. Disclosure of this

type is generally known as "open date labeling." The vendor, or potential vendor, must disclose either of two dates. It may set forth the "last date of use," defined in § 101.19(a)(2) as the "date beyond which the product may not be fit for consumption" when "stored under those conditions recommended for storage of the product on the label." In determining this date, the manufacturer is to consider factors, listed in (a)(2), which may significantly change the product after the date of its packaging. Alternatively, the vendor may disclose a "pull date," defined in § 101.19(a)(5) as "the date after which the product may not be of the quality which the manufacturer represents it to be," determined by the manufacturer on consideration of factors relating to the quality of the product, again on the assumption that the product will be stored as recommended on its label.[3]

The GMA advances a multitude of challenges to the regulation. It contends that the department lacked statutory authority to adopt the regulation, and that, even if the department had that authority, the regulation is invalid because the department failed to conform with various procedural requirements. Additionally, the GMA argues on constitutional grounds that (a) the regulation impermissibly intrudes on an area preempted by the Federal government, (b) the regulation improperly burdens interstate commerce,

---

[3] Open date labeling discloses a product's "shelf life," defined in § 101.19(a)(6) as "the period of time during which a food product is of unimpaired quality." All food products are subject to deterioration or alteration, but the regulation makes a distinction between "perishable" and "non-perishable" food products, dividing food products between those with a shelf life of sixty days or less ("perishable") and those with a shelf life of more than sixty days ("non-perishable"). The only significance of this distinction is the effective date of the regulation as to each class. It became effective as to "perishable" foods on July 1, 1979. By extensions granted since the adoption of the regulation, it will become applicable to frozen "non-perishable" foods on May 1, 1981, and to other "non-perishable" foods on May 1, 1982. The GMA's challenge here is directed only toward the application of the regulation to "non-perishable foods," although many, if not all, of its arguments appear applicable to "perishable" foods as well.

and (c) the regulation denies due process of law because it is void for vagueness and lacks a rational basis for its enactment as a police power measure. We reject all these contentions.

As far back as 1973, the department undertook consideration of the adoption of food labeling regulations, including open date labeling, and held a public hearing on the subject. After receiving numerous comments and criticisms, in the fall of 1976 the department proposed food labeling regulations and held another public hearing. After this hearing, the department requested further information from the GMA itself and from the National Canners Association, among others, concerning (a) the economic impact of the proposed open date labeling regulations for "non-perishable" foods and (b) the nutritive loss or deterioration (such as loss of color, flavor or aroma) in non-perishable foods. In April, 1977, the Public Health Council of the department adopted regulations concerning ingredient labeling, nutrition labeling, and labeling of "organic" foods, but adopted no open date labeling regulations. In May, 1977, the National Canners Association (now the National Food Processors Association) undertook consideration of a voluntary open date program and asked the department to delay action on its regulation. The department received numerous comments on the regulation between November, 1976, and July 26, 1978.

In July, 1978, the Public Health Council of the department provisionally approved an open date regulation, and by July 25, 1978, further comments had been received from several sources. On that date, the Public Health Council approved certain modifications in the regulation it had provisionally approved, and adopted the modified regulation, which was published in the Massachusetts Register on August 31, 1978. [4]

---

[4] The GMA's claim that the Public Health Council did not adopt the regulation in the form in which it was published in the Massachusetts Register is discussed below.

The parties have filed a statement of agreed facts which we summarize in part. All food manufacturers agree that a food product may not be of that quality which a manufacturer expects of its product at the time of consumption if it is subjected to adverse conditions of temperature, humidity, light, handling, or some combination of these elements. Most food manufacturers have an opinion as to the minimum period during which, under normal conditions, their products will be of the quality which they expect at the time of consumption. Various manufacturers have identified the shelf lives of their products. Most food packages include coded information which identifies the place and date of packaging. Some openly show dates of packaging. Some local supermarket chains and several national companies voluntarily use open dates for some or all of their non-perishable food products, although most manufacturers do not open date their non-perishable products. The National Food Processors Association has undertaken a voluntary open date program for canned goods. There is an indication of substantial consumer interest in open date labeling. Although there are requirements for open date labeling of perishable food products in some other jurisdictions, we are advised that open date labeling is not required for "non-perishable" foods anywhere else in the country.

1. *The department's authority to promulgate the regulation.* The GMA argues that the department lacked statutory authority to adopt any regulation requiring open date labeling. It contends that G. L. c. 94, § 187, which defines the term "misbranded," cannot be read to authorize a regulation requiring disclosure of "the pull date or the last date of use" of non-perishable food. In short, the GMA contends that misbranding speaks only to active misrepresentations. In support of this view, the GMA argues that the Legislature has enacted affirmative disclosure requirements, containing specific details, in those situations where active representations must be made and that open date labeling is not one of these situations. The GMA further contends that the regulation is invalid because, in particular

respects, it is inconsistent with portions of G. L. c. 94, §§ 186-195.

The general principles governing agency authority to issue a regulation are not in substantial dispute. A regulation may be authorized even where it cannot be traced to specific statutory language. See *Levy* v. *Board of Registration & Discipline in Medicine*, 378 Mass. 519, 523-524 (1979); *Opinion of the Justices*, 368 Mass. 831, 834-835 (1975); *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 363 Mass. 474, 494 (1973). "An agency's powers are shaped by its organic statute taken as a whole." *Commonwealth* v. *Cerveny*, 373 Mass. 345, 354 (1977). Powers granted include those necessarily or reasonably implied. *Opinion of the Justices, supra. Bureau of Old Age Assistance of Natick* v. *Commissioner of Pub. Welfare*, 326 Mass. 121, 124 (1950). An agency, of course, has considerable leeway in interpreting a statute it is charged with enforcing. *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 850 (1977). The Legislature may delegate to an agency "the authority under proper statutory guidelines to define more precisely by regulation the nature of an offense." *Commonwealth* v. *Racine*, 372 Mass. 631, 635-636 (1977).

In certain situations, of which this is not one, the Legislature has granted broad agency authority to deal with an entire area of activity. See, e.g., *Warner Cable of Mass. Inc.* v. *Community Antenna Television Comm'n*, 372 Mass. 495 (1977) (regulation of cable television throughout Commonwealth); *Colella* v. *State Racing Comm'n*, 360 Mass. 152, 153-154 (1971) ("full power to prescribe rules, regulations and conditions under which all horse or dog races . . . shall be conducted in the commonwealth"); *Universal Mach. Co.* v. *Alcoholic Beverages Control Comm'n*, 301 Mass. 40, 44 (1938) ("comprehensive and exclusive jurisdiction" over businesses engaging in sale of alcoholic beverages). Where no such broad statutory grant exists, closer scrutiny of the authority of the agency is required and has been applied. *Commonwealth* v. *Racine*, 372 Mass. 631 (1977) (regulation

imposing a fine upheld as furthering goal stated in statute). *Commonwealth* v. *Cerveny*, 373 Mass. 345 (1977) (power to require forms to be signed under oath implied from power to subpoena and to administer oaths). *Commonwealth* v. *Rivkin*, 329 Mass. 586 (1952) (power to prohibit sales not granted by authority to regulate conditions under which sales could be made). *Commonwealth* v. *Johnson Wholesale Perfume Co.*, 304 Mass. 452 (1939) (regulation purporting to add additional requirement to statute, held invalid).

We conclude that the authority granted by G. L. c. 94, § 192,[5] to regulate the sale of misbranded food, that is, a food with a label "misleading in any particular" (G. L. c. 94, § 187), includes an omission of fact as well as an express misstatement of fact. The regulation seeks to eliminate the implied representation, which derives from the item's availability for sale, that the food is fit for consumption ("last date of use") or that it is of the quality which the manufacturer represents it to be ("pull date"). Plainly, misbranding as defined in § 187 may include an omission. Various portions of § 187 relate to misbranding by omission. See, e.g., § 187, "food" Ninth, Eleventh, Twelfth, Fourteenth pars.

The fact that various sections of G. L. c. 94 grant the department authority to prescribe regulations in great detail on particular subjects does not limit the department's authority to deal with other matters under more general statutory guidelines. Specific statutory authority to act in a particular respect does not bar consistent action under general statutory authority. See *Levy* v. *Board of Registration & Discipline in Medicine*, 378 Mass. 519, 524 (1979);

---

[5] Section 192, as amended through St. 1961, c. 600, § 8, reads in relevant part as follows:

"The department of public health shall enforce sections one hundred and eighty-six to one hundred and ninety-five, inclusive. . . . Said department, after a public hearing, shall adopt and promulgate rules and regulations consistent with said sections, and, except as to standards fixed by law, may adopt standards, tolerances and definitions of purity or quality or identity for articles of food, drugs or devices, and may adopt rules and regulations consistent with said section for cosmetics."

*Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 363 Mass. 474, 496 (1973). Acceptance of the GMA's argument that detailed statutory language in G. L. c. 94 concerning a subject bars regulation of that subject under the general statutory authority of § 192 would completely and illogically free the subjects of specific statutory regulation from treatment as "misbranded" (§ 187) products.

The GMA makes several claims that the regulation is in conflict with certain statutory provisions. In this facial attack on the regulation we do not have an actual controversy, as required for the issuance of a declaratory judgment (G. L. c. 231A, § 1), concerning the conflict of the regulation with specific statutes. Even if the alleged conflicts do exist, they go only to details of the procedural operation of the regulation and would not warrant the invalidation of the entire regulation. We should not be understood as implying the validity or invalidity of the GMA's challenges.[6]

2. *Procedural challenges.* The GMA makes a series of procedural challenges to the regulation, none of which has merit.

The GMA alleges procedural deficiencies in the public hearing held prior to the adoption of the regulation. The

[6] Some of the arguments are as follows: (1) The regulation conflicts with § 189 because it does not incorporate the procedural requirements of that section. It is not clear that the procedural requirements of § 189, if they are applicable to open date labeling, cannot be complied with as well as those of the regulation. (2) Section 194 requires the department to refer certain violations "to the proper national authorities for their action," not to ban the product, a practice the regulation permits. Section 194 appears to relate to penalties for certain dealers who sell a misbranded product, not to the consequences to the misbranded product. (3) Section 189A provides for a court determination that an article is misbranded before it may be ordered destroyed or directed to be relabeled. Subsection (f) of the regulation allows the department to determine that a date selected for any food product is not justified and, after a hearing, to order the packer or manufacturer to change the date in accordance with the department's findings. The GMA claims that the regulation conflicts with § 189A. It may be that § 189A's requirement of a judicial determination of misbranding as a prerequisite to remedial action would make ineffective any department direction to correct the label date, in the absence of a court order. If this potential conflict is not resolved before the issue arises, the courts may have to settle the issue.

statute contains no requirement that the Public Health Council itself hold the hearing. "Hearings of the department may be held by the commissioner, or his designee." G. L. c. 111, § 3, as amended through St. 1973, c. 1168, § 19. Neither the delay between the date of the hearing and the date of the adoption of the regulation nor the changes made in the regulation during that period created a procedural infirmity. The delay of approximately eighteen months was not excessive, in light of the complexity of the regulation and the significant amount of industry opposition expressed at the hearing. The department used this time to evaluate the basis of industry opposition, to obtain additional material from interested parties, and to encourage a voluntary program of open date labeling. The channels of communication between the GMA and the department were kept open through a series of meetings and through correspondence. The GMA was not deprived of an opportunity to comment on the proposed regulation, nor does it appear to have been prejudiced by any delay. Contrast *Gricus* v. *Superintendent & Inspector of Bldgs. of Cambridge*, 345 Mass. 687, 691 (1963) (five-year lapse and change in composition of majority of board); Rep. A.G., Pub. Doc. No. 12, at 34 (1955) (five-year lapse and change in interested parties). We note, moreover, that on more than one occasion the department was urged by interested parties to postpone its decision on open date labeling.

The changes in the regulation, made in response to suggestions at the public hearings, were not so extensive as to make the regulation "in effect, a different regulation from the one as to which the proceeding was held" so as to require a new hearing, as the GMA contends. "The requirement of submission of a proposed rule for comment does not automatically generate a new opportunity for comment merely because the rule promulgated by the agency differs from the rule it proposed, partly at least in response to submissions." *International Harvester Co.* v. *Ruckelshaus*, 478 F.2d 615, 632 (D.C. Cir. 1973) (footnote omitted). "A hearing is intended to educate an agency to approaches dif-

ferent from its own; in shaping the final rule it may and should draw on the comments tendered." *South Terminal Corp.* v. *Environmental Protection Agency*, 504 F.2d 646, 659 (1st Cir. 1974). Many of the changes in the regulation were made in response to industry criticisms and suggestions. The regulation as adopted is "a logical outgrowth of the hearing and related procedures." *Id.* A further public hearing was not required.

The GMA argues that the regulation as approved by the Public Health Council differs from the regulation as it appears in its final form in the Massachusetts Register. The statement of agreed facts provides that all the exhibits in this case "may be considered by the Court as authentic and genuine." One of those exhibits, the minutes of the Public Health Council meeting of July 25, 1978, contains a copy of the regulation as adopted on that date. That copy is identical to the one published in the Massachusetts Register. The GMA's argument that the regulation as it appears in the Massachusetts Register differs from the draft regulation that was presented at the July 25 meeting overlooks the fact that the regulation as approved at that meeting incorporated "amendments of Council made on that date." Obviously, these amendments, which were trivial, could not have already been incorporated in the draft that was then physically before the Council. The Council discussed and agreed to these amendments at the July 25 meeting, and approved the regulation in the form in which it appears in the Massachusetts Register. The GMA has failed to rebut the statutory presumption of legitimate adoption of the regulation as published in the Massachusetts Register (G. L. c. 30A, § 6), and the record shows no defect in the department's procedures in any event.

The GMA seeks to impose on the department a requirement of including in the record a statement of the legislative facts supporting the regulation. There is no such requirement in the law of the Commonwealth. "[F]or the court to check back on the agency's 'reasons' and 'determination[s]' of fact and law would have an unhealthy tendency to substi-

tute the court for the agency as policymaker." *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 363 Mass. 474, 491 (1973). The GMA's reliance on cases decided under the Federal Administrative Procedure Act is misplaced because this State's Administrative Procedure Act (G. L. c. 30A) does not require agency findings of legislative facts in the record in a regulatory proceeding. Compare 5 U.S.C. § 553(c) (1976) with G. L. c. 30A, § 2. The United States Supreme Court has recently held that a reviewing court should not impose procedural requirements on administrative agencies in addition to those imposed by Congress. *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U.S. 519, 524-525 (1978). We have recently stated that "the approach of a court to an agency regulation is as deferential as that to a legislative enactment." *Greenleaf Fin. Co.* v. *Small Loans Regulatory Bd.*, 377 Mass. 282, 293 (1979).

The answer to the GMA's claim that fairness demands that it be given an opportunity to challenge "crucial legislative facts" is that it was given just such an opportunity at the public hearing and in its continued communications with the department. On review of the regulation, it is not open to the GMA to argue that the regulation was unsupported by substantial evidence; the GMA must show that the regulation was arbitrary or capricious. *Greenleaf Fin. Co., supra,* and cases cited. Compare G. L. c. 30A, § 7, with *id.* § 14(7). As discussed below, the GMA has made no such showing.

3. *Constitutional arguments.* The GMA presents a variety of challenges to the regulation based on asserted constitutional violations. None of them has merit.

The GMA has failed to prove that the operation of the regulation will impose an impermissible burden on interstate commerce. Where, as here, the regulation does not discriminate between in-State and out-of-State businesses and its effects on interstate commerce are only incidental, the regulation "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The record does not establish that the regulation

379 Mass. 70                                              81

Grocery Manufacturers of America, Inc. v. Department of Public Health.

will burden interstate commerce and certainly does not demonstrate any excessive burden. In a challenge under G. L. c. 30A, § 7, to a regulation, the plaintiff must prove its case in the judicial proceeding. See *Greenleaf Fin. Co. v. Small Loans Regulatory Bd.*, 377 Mass. 282, 293, 301 (1979). Cf. *Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc.*, 376 Mass. 313, 323 (1978); *Aeration Processes, Inc. v. Commissioner of Pub. Health*, 346 Mass. 546, 554 n.7 (1963). Facts represented in material submitted to an agency, unless stipulated as admitted, may not be relied on in a judicial challenge to an administrative regulation.

The GMA's argument that Federal law has preempted the field of activity governed by the regulation must fail. There is no Federal statutory provision expressly precluding State regulation of open date labeling. Nor is there any Federal statute impliedly preempting the field. Preemption is not "to be inferred merely from the comprehensive character of [Federal legislation]." *New York State Dep't of Social Servs. v. Dublino*, 413 U.S. 405, 415 (1973).

The typical preemption case involves State and Federal regulation of the same subject. In such a case, "[t]he criterion for determining whether state and federal laws are so inconsistent that the state law must give way is . . . 'whether, under the circumstances of the particular case, [the State's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977), quoting from *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). If there is somehow a conflict with objectives of the Federal Food, Drug, and Cosmetic Act, and related regulations, the GMA has not demonstrated what that conflict is. In a case where a conflict with Federal objectives is asserted, the court must "consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Jones v. Rath Packing Co.*, *supra*. See *DeCanas v. Bica*, 424 U.S. 351, 363-365 (1976); *New York State Dep't of Social Servs. v. Dublino*, *supra* at 417. Plaintiffs are "required to prove their case with hard

evidence of conflict, and not merely with unsupported pronouncements as to [Federal] 'policy.' It is on the basis of the record evidence in this case that we must determine whether there is an actual, impermissible conflict between the local and federal law." *Kargman* v. *Sullivan,* 552 F.2d 2, 6 (1st Cir. 1977). See *Aeration Processes, Inc.* v. *Commissioner of Pub. Health,* 346 Mass. 546, 554 n.7 (1963). The record in this case does not warrant, much less require, a conclusion that there is an improper conflict between the regulation and any Federal law.

The regulation acknowledges the preemption of labeling of "meat food products" and "poultry products" by the Federal Meat Inspection Act and the Poultry Products Inspection Act. See 21 U.S.C. §§ 453(e)-(f); 601(j) (1976) and the specific preemption provisions of 21 U.S.C. §§ 467e and 678 (1976). The definition of "food" in 105 Code Mass. Regs. 520.023 (J), which is incorporated into § 101.19, exempts "meat food products and poultry products as defined in [G. L. c. 94, § 118]." The definitions in § 118 track the definitions in the Federal statutes.

The GMA seeks a determination of the extent of the preemption concerning meat and poultry food products. Relief through a declaratory judgment proceeding requires an actual controversy. G. L. c. 231A, § 1. Because the department and the regulation acknowledge this Federal preemption, there is no controversy over its existence. Although the parties disagree over the interpretation of the relevant statutory provisions, the stipulated facts do not furnish sufficient information concerning specific meat and poultry products for us to determine the extent of Federal preemption. The scope of that preemption will have to be determined case by case on a consideration of facts which have not been shown on this record.[7]

---

[7] The GMA argues that the department should have made findings indicating its careful consideration and resolution of the interstate commerce and Federal preemption issues. The State Administrative Procedure Act imposes no such obligation in a regulatory, as opposed to an adjudicatory, proceeding. Compare G. L. c. 30A, § 7, with *id.* § 14. The GMA relies

The GMA argues that the regulation is void for vagueness, and thus violates the Fourteenth Amendment of the Constitution of the United States and art. 10 of our Declaration of Rights. In a statute regulating business activities, broad words of general meaning may be sufficiently definite in the circumstances to meet the constitutional test. *Commonwealth* v. *Gustafsson*, 370 Mass. 181, 187 (1976). We have assumed, without deciding, that a regulation whose violation is a criminal act is tested by a higher standard of definiteness than a noncriminal regulation. See *Aristocratic Restaurant of Mass., Inc.* v. *Alcoholic Beverages Control Comm'n (No. 1)*, 374 Mass. 547, 553, appeal dismissed, 439 U.S. 803 (1978). In our analysis we shall continue to make that assumption. Further, we shall treat the regulation as one whose violation might lead to criminal prosecution, although a manufacturer who makes a good faith attempt to comply with the regulation appears unlikely

on *Penn Cent. Co.* v. *Department of Pub. Utils.*, 356 Mass. 478 (1969), where this court sent a regulatory proceeding back to the administrative agency for findings in a case involving an agency regulation said to run afoul of the interstate commerce clause and Federal preemption of the area. We have never since applied the principle of the *Penn Cent.* case. We declined to expand the requirement of agency findings in *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 363 Mass. 474, 492-493 (1973), saying that the "*Penn Cent.* case can apply only to extraordinary situations." *Id.* at 492.

It is not necessary to decide whether we would today perpetuate the judicial embellishment on the State Administrative Procedure Act which the *Penn Cent.* case represents. It is sufficient to note that the apparent tensions with, and agency indifference to, Federalism concerns that the *Penn Cent.* case presented are not present here. The possible conflict with Federal law and the possible imposition of an unacceptable burden on interstate commerce are not so apparent here as to require agency findings, even if the principle of the *Penn Cent.* case is still viable. In short, this is not an "extraordinary" situation.

In any event, the record demonstrates the department's attention to the problems of Federalism. The department prepared a brief memorandum adverting specifically to the requirements of the *Penn Cent.* case and concluding that "there seems to be no discernible conflict with federal law." The regulation itself contains a reciprocity provision that grants an exemption for products that comply with equivalent open date labeling requirements of another agency. § 101.19(g). The department also expressly excluded meat and poultry products from the regulation's ambit.

to be subjected to criminal proceedings prior to an administrative analysis of, and decision concerning, its conduct. Where there is an opportunity to resolve ambiguities of application administratively prior to criminal prosecution, the threat of unfair indefiniteness is greatly reduced. Cf. *Tober Foreign Motors, Inc.* v. *Reiter Oldsmobile, Inc.*, 376 Mass. 313, 332 (1978).

A criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated action is forbidden must be treated as void for vagueness. *Opinion of the Justices*, 378 Mass. 822, 826-827 (1979), and cases cited. Yet even criminal statutes need not be drafted with "mathematical precision." *Commonwealth v. Bohmer*, 374 Mass. 368, 372 (1978). The test is whether the standard is comprehensible to persons of common intelligence, not whether it may be imprecise. *Commonwealth v. Orlando*, 371 Mass. 732, 734 (1977).

The regulation is not unconstitutionally vague. Certainly, every manufacturer is placed on notice that it must disclose either "the pull date" or "the last date of use" of any food product governed by the regulation, as it chooses. The alleged imprecision of the regulation concerning the method for determining the proper date for each product is eliminated by the regulation's substantial deference to the manufacturer's judgment concerning the date to be disclosed. We regard the regulation as sufficiently definite to give a manufacturer fair notice of what is required. The regulation is not unconstitutionally vague on its face, and the record does not disclose any particular product as to which it is unconstitutionally vague as applied.[8]

_____

[8] The proposed effective date of the regulation is earlier for "perishable" foods than for "non-perishable" foods. The question whether a product has a shelf life of sixty days or less, and is thus a "perishable food," or has a longer shelf life and is therefore a "non-perishable food" may be a close one in given instances. However, "[u]ncertainty as to whether marginal offenses are included within the coverage of a statute does not render it unconstitutional if its scope is substantially clear." *Commonwealth v. Bohmer*, 374 Mass. 368, 372 (1978). "Shelf life" is defined as "the period of time during which a food product is of unimpaired quality." Reg.

379 Mass. 70                                                85

Grocery Manufacturers of America, Inc. v. Department of Public Health.

There is no merit to the GMA's argument that the regulation is invalid because it does not bear "a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare." *Coffee-Rich, Inc. v. Commissioner of Pub. Health,* 348 Mass. 414, 422 (1965), quoting from *Sperry & Hutchinson Co. v. Director of the Div. on the Necessaries of Life,* 307 Mass. 408, 418 (1940). See also *Mobil Oil Corp. v. Attorney Gen.,* 361 Mass. 401, 412-413 (1972). All rational presumptions are to be made in favor of the validity of the regulation. *Coffee-Rich, Inc. v. Commissioner of Pub. Health, supra.* "[T]he approach of a court to an agency regulation is as deferential as that to a legislative enactment." *Greenleaf Fin. Co. v. Small Loans Regulatory Bd.,* 377 Mass. 282, 293 (1979). Requiring information concerning the nutrition and quality of food promotes the public health and safety, as those words are used in defining the police power of a State. The question for our consideration is not whether open date labeling is good policy but whether the regulation bears a reasonable relation to the goal of consumer protection. The parties have stipulated that all foods, even "non-perishable" foods, are altered with the passage of time. A regulation that requires the disclosure of otherwise unavailable information concerning the quality of food products has a rational basis. The GMA has failed to meet its heavy burden of demonstrating that the regulation is irrational. See *Commonwealth v. Henry's Drywall Co.,* 366 Mass. 539, 541-542 (1974).

4. Judgment shall be entered declaring that the department was authorized to adopt the regulation and did so in

---

101.19(a)(6). Admittedly, the shelf life of a particular food item will vary depending on a number of factors in its handling. The parties have stipulated that most food manufacturers "have an opinion as to the minimum period during which — assuming normal conditions of temperature, humidity, light and handling — their respective products will be of the quality which each manufacturer expects of its product at the time of consumption." Again, we construe the regulation as requiring, in the first instance, only a good faith judgment of the shelf life of a food product.

conformity with the requirements of law. Additionally, the judgment shall declare that the unconstitutionality of the regulation has not been demonstrated in this proceeding.

*So ordered.*

APPENDIX.

SECTION 101.19   FOOD, OPEN DATE LABELING

(a) For the purpose of this section, the following terms shall have the following meanings:

(1) "Frozen foods" shall mean articles used for food or drink which have been packaged and preserved by freezing.

(2) "Last date of use" shall mean that date beyond which the product may not be fit for consumption. In establishing the last date of use, the manufacturer shall assume that the product will be stored under those conditions recommended for storage of the product on the label, and shall consider:

(A) significant change in the texture, color or aroma of the product from and after the date of pack;

(B) staleness of the product;

(C) loss of functional property(ies) of the product;

(D) the likelihood of container deterioration;

(E) the likelihood of decomposition or spoilage;

(F) any other change in the product which, in the opinion of the manufacturer, renders the product not fit for consumption.

(3) "Non-perishable food" means food that has a shelf life of more than 60 days after manufacture.

(4) "Perishable food" means food that has a shelf life of 60 days or less after manufacture.

(5) "Pull date" means the date after which the product may not be of the quality which the manufacturer represents it to be. The phrases "last date of sale" or "for best quality use by" shall be synonymous with "pull date." This date shall be determined by the manufacturer upon consideration of factors pertaining to quality, including but not limited to nutritive loss, or loss of flavor, texture, color or aroma, as evaluated by any testing procedures currently utilized by the food industry to determine the quality of food. In determining this date, the manufacturer shall assume that the product will be stored under those conditions recom-

379 Mass. 70                                                        87

Grocery Manufacturers of America, Inc. v. Department of Public Health.

mended for storage of the product on the label. In no event shall the date established hereunder be later than the last date on which the product can be sold without a significant risk that it will exceed its last date of use if stored by the purchaser prior to consumption for the period and in the manner which such a product can reasonably be expected to be stored.

(6) "Shelf life" means the period of time during which a food product is of unimpaired quality.

(b) No person shall sell, offer for sale, or have in his possession with intent to sell, a food product in package form unless the package of said food has legibly been stamped, printed, or otherwise conspicuously marked in bold face type of contrasting color and in letters at least 1/8 inch in height in a manner set forth below, except that when the letters are embossed in a can, bottle, or plastic container, they need not be in a contrasting color.

(c) The manufacturer of a food product shall place on the package either the pull date or the last date of use of the food and labeled as follows:

(1) The date shall consist of the common abbreviation for the calendar month and numerals for the day and year, or numerals for the month, day and year, e.g., Feb. 10, 77 or 2/10/77, for February 10, 1977. A perishable food need not have the year identification included in the date and a nonperishable food need not have the day identification included in the date.

(2) Fresh bakery products may be dated with only the day designation, e.g., Monday, Tuesday, or an abbreviation thereof, e.g., Mon., Tues., which shall be attached to the package by a tie or clip. If dated in this fashion, fresh bakery products shall be exempt from the requirements of section 101.19(c)(1).

(3) An explanation describing the meaning of the date must be in close proximity to the date. Examples of explanations are "use before ---", "sell by ---", or "for best quality use by ---", the blank space filled with the date specified in Sections 101.19(c)(1) or (c)(2).

(4) If the date does not appear on the principal display panel, the information panel, or on another conspicuous portion of the package, a statement must appear on the principal display panel or information panel indicating where on the package the date can be found. This statement shall also contain the information required in Section 101.19(c)(3) if because of technical problems, e.g., embossing on a can, it is impractical to have the explanatory statement in close proximity to the date. Examples of such a statement would be: — "Last date of sale on lid", or "use before date on end", or "sell by date on bottom".

(5) If a condition(s) of storage affects the date, the recommended storage condition(s) must be stated on the label.

(d) Food which has passed its pull date may be sold, *Provided, That,* the food is segregated from food which has not passed its date, and *Provided, further,* that the food is clearly and conspicuously marked either on

each package or through the use of shelf markers or place cards, as being offered for sale "PAST DATE". This section shall not be construed to allow the sale of adulterated food or food which has passed its last date of use.

(e) Any product subject to Section 101.19 which is not dated and labeled in accordance with the provisions of said section, shall be deemed "misbranded" under General Laws, Chapter 94, Section 187.

(f) Upon request of the Department, the packer or manufacturer shall file a statement as to the period of time between the date of manufacture and either the last date of sale or the last date of use, whichever is used for that food. If the food package bears a lot identification code indicating the date of manufacture, the Department may also require the packer or manufacturer to file the interpretation of said code. If, after conducting an investigation, the Department determines that the date selected is not supported by its findings, it shall direct the packer or manufacturer to change the date in accordance with such findings. Any packer or manufacturer aggrieved by such an order shall be afforded the opportunity for hearing. The order shall not be overturned unless the appellant establishes by clear and convincing evidence that the date originally selected is in fact justifiable under sections 101.19(a)(2) or (5). The order shall be considered final unless reversed upon such review. Pending review, the affected product may not be offered for sale unless the date is modified in accordance with the order of the Department.

(g) Any packer or manufacturer may apply to the Department for an exemption from the provisions of Section 101.19. An exemption shall be granted if:

(1) The product for which the exemption is sought is open dated in accordance with the regulations of another agency; and

(2) compliance with the regulations of the other agency will result in the disclosure to consumers of substantially the same information as is required by these regulations;

(h) The following foods are exempt from this section:

(1) Fresh meat, fresh poultry, fresh fish, fresh fruits, and fresh vegetables.

(2) Food products shipped in bulk form for use solely in the manufacture of other foods and not for distribution to the consumers in such bulk form or container.

(3) Sugar.

(4) Salt.

(5) Food in a hermetically sealed container which has been heat sterilized so that it may be stored without refrigeration. It is the understanding of the Department that such food shall be open dated under a voluntary plan formulated by the National Food Processers Association, and that a substantial portion (85% to 90%) of such food products are expected to be in compliance with these regulations no later

Grocery Manufacturers of America, Inc. *v.* Department of Public Health.

than July 1, 1981. In the event the voluntary program fails to produce satisfactory progress toward and attainment of this goal, the Department shall promulgate a mandatory compliance date for such food products.

(i) Notwithstanding any other effective dates set forth in the Labeling Regulations, Section 101.19 shall take effect in accordance with the following schedule:

(1) For perishable foods, the effective date shall be July 1, 1979.

(2) For frozen foods, the effective date shall be July 1, 1980.

(3) For remaining non-perishable foods, the effective date shall be July 1, 1981.

(j) Any packer or manufacturer who voluntarily dates a food product which is not subject to Section 101.19 shall nevertheless be subject to the provisions of subsection (f).

Approved and adopted by the Department of Public Health at its meeting of July 25, 1978. Incorporates amendments of Council made on that date.

*August 21, 1978*

*Attest: (s) Barbara Corcoran*
*Secretary to the Department*