Kottmyer, J.
Plaintiff, Charles Welsh, and the intervenors[1] are inmates at Souza Baranowski Correctional Center ("SBCC”) subject to G.L.c. 22E, §3, which requires persons convicted of certain crimes to submit samples of their deoxyribonucleic acid (“DNA”). They seek, inter alia, a declaration that 103 C.M.R. 405.18 and the DNA Assessment Procedures promulgated by the defendant Department of Correction (“DOC”), relating to the determination of indigence and the assessment of costs of collecting and processing DNA samples, are invalid.
Section 4(b) of G.L.c. 22E provides that “the cost of preparing, collecting and processing a DNA sample shall be assessed against the person required to submit a DNA sample, unless such person is indigent as defined in Section 27A of Chapter 261.” Plaintiff and the intervenors allege that they are indigent as defined in Section 27A, but that DOC, relying upon 103 C.M.R. §405.18(2) and its DNA Assessment Procedures, froze their personal accounts and confiscated funds ($110) to pay DNA costs. They seek an order enjoining DOC from continuing to enforce 103 C.M.R. §405.18(2) and its DNA Assessment Procedures.
Because the issue as to the validity of §405.18(2) and the DNA Assessment Procedures had been previously litigated by DOC[2] and involves principally a question of law, the Court ordered the trial on the merits to be advanced and consolidated with the hearing on the application for a preliminary injunction. Trial was held on March 2 and 9, 2001, and the parties submitted supplemental memoranda on March 16, 2001.
After trial, I find, for the reasons stated below, that 103 C.M.R. §405.18 is ultra vires and void to the extent that it 1) authorizes DOC’s Director of Administrative Services to define indigence for the purpose of assessing costs of collecting and processing DNA samples; and 2) authorizes the Commissioner to impound and seize funds from inmates’ accounts without their consent for the purpose of paying such costs.[3]
A. The DNA Database Act
In 1997, the Legislature enacted the DNA Database Act, St. 1997, c. 106, §7, which added Chapter 22E (“the Act”). Section 3 of Chapter 22E requires persons convicted of listed offenses to submit a DNA sample to the Department of the State Police. Section 4(b) provides that persons required to submit DNA samples shall pay the costs of collecting, preparing and processing those samples, unless the person submitting the sample is indigent as defined in Section 27A of Chapter 261. In Sections 4(a), 6 and 8 respectively, the Act authorizes the director of the crime laboratory within the Department of State Police to establish 1) regulations or procedures for the collection of DNA samples; 2) regulations governing the collection, receipt, identification, storage and disposal of DNA samples; and 3) procedural rules governing the testing and analysis of DNA samples.[4] The Act does not authorize the Commissioner of the Department of Correction (“the Commissioner”) to promulgate regulations.
Costs of collecting and processing DNA samples are to be determined by the Secretary of Administration and Finance and costs shall be paid to the Department of the State Police. G.L.c. 22E, §4(b). The Secretary of Administration and Finance has set the fee at $110. 801 C.M.R. §402.520(4).
B. The DOC Regulation and DNA Collection Procedures
DOC thereafter enacted 103 C.M.R. §405.18. Sub-part (2), entitled “Other Authorized Assessments,” provides:
An inmate who is the subject of any authorized assessment, including but not limited to, the cost of preparing, collecting, and processing of DNA samples and other legislatively authorized assessments, may consent to having funds debited from his savings and personal accounts to satisfy such assessments.
Where an inmate is not “indigent” and refuses to consent to the voluntary debiting of his savings and personal accounts, the Superintendent
may order the debiting of the inmate’s savings and personal accounts for up to 1/2 of the money earned by the inmate while incarcerated and any unearned funds [or, if the inmate is serving a life sentence or is a Sexually Dangerous Person all money maybe debited). Id. 2(d).
Where the amount debited from an inmate’s accounts is insufficient to satisfy the assessment
the Superintendent may order the impoundment of the inmate’s accounts for the remaining amount. During the period of impoundment no account funds may be expended by the inmate. Id. 2(e).
In subsection 2(c), the regulation directs DOC’s Director of Administrative Services to establish standards for determining indigence for purposes of 103 C.M.R. §405(18). Pursuant to that section, DOC’s Director of Administrative Services promulgated “DNA *140 Assessment Procedures.” The DNA Assessment Procedures state:
The institutional Treasurer shall denote indigent inmates which is defined pursuant to 103 C.M.R. 405.18 as one who has had less that [sic] ten dollars in his/her account for the preceding sixty days prior to the date of collection . . . “Account” shall be defined hereinafter as both savings and personal accounts as well as any other accrued funds unless otherwise stated.
C. The Determination of Indigence
The DOC regulation and DNA Assessment Procedures are in conflict with the plain language of Chapter 22E which provides that the definition of indigence in Section 27A of Chapter 261 governs the determination of indigence for purposes of assessing costs under Section 4(b). The statute does not authorize the Commissioner to define indigence. The definition of indigence adopted by DOC’s Director of Administrative Services excludes from the category of indigent persons inmates who are covered by the most restrictive interpretation of §27A.
Section 27A defines the word “indigent” as follows:
(a) a person who receives public assistance ... , or
(b) a person whose income, after taxes, is one hundred twenty-five percent or less of the current poverty threshold annually established by the Community Services Administration ... or (c) a person who is unable to pay the fees and costs of the proceeding in which he is involved, or is unable to do so without depriving himself or his dependents of the necessities of life, including food, shelter and clothing, but an inmate shall not be adjudged indigent pursuant to section 27C [relating to the costs of court proceedings] unless the inmate has complied with the procedures set forth in Section [29][5] and the court finds that the inmate is incapable of making payments under the plan set forth in said section [29],
Clauses (a) and (b) do not apply to inmates. See, e.g., Schmitt v. Department of Correction, Suffolk Sup.Ct. Civ. Action No. 99-4305 & 4298 (King, J.) (Nov. 29, 1999); Moore v. Maloney, Suffolk Sup.Ct. Civ. Action No. 98-0019 (Lauriat, J.) (July 20, 1998); Fruchtman v. Maloney, Suffolk Sup.Ct. Civ. Action No. 97-6097 (Hinkle, J.) (8 Mass. L. Rptr. 288) (March 20, 1998). Section 29 applies to inmates seeking waiver of filing fees and costs in certain cases filed in court. When it adopted the definition of indigent in Section 27A for purposes of the Act, the Legislature presumably contemplated that the proviso relating to inmates in Section 27A would apply to the determination of indigence for purposes of assessing DNA costs given the obvious fact that many, if not the majority, of those required to provide samples will be incarcerated at the time the sample is taken. Under Section 29, inmates who have less than a $50 average balance in their accounts over a six-month period preceding the determination and no other resources are indigent.[6] Under the DOC definition, an inmate does not qualify as indigent unless the balance in his account was less than ten dollars for the preceding sixty days.
The Department argues that the intervenors are not indigent under subpart (c) because all necessities of life are provided by the DOC at the Commonwealth’s expense. DOC’s position that the necessities of life are provided to inmates is not supported by the record. The record establishes that upon arrival, a new inmate receives three complete sets of underwear, three scrub suits and footwear. Inmates also receive a jacket and knit'cap during cold weather months. The footwear issued by the DOC (canvas slip-ons) is not suitable for exercise or for use outside in cold or inclement weather.[7] Inmates receive one roll of toilet paper per week. Inmates receive no other clothes and no supplies to maintain basic standards of personal hygiene unless they are indigent under the DOC standard.
Under DOC procedures,[8] inmates who qualify as indigent under the DOC standard may submit request forms to obtain replacement or additional clothes and limited supplies for maintenance of personal hygiene. The DOC standard excludes from the definition of indigent any inmate who has had more than $ 10 in his accounts for the previous sixty (60) days.[9] (Russo Aff. ¶3.) A unit manager reviews the request for clothes or supplies and does not approve it if the inmate does not qualify as indigent under the DOC standard.
If a request for clothing is approved, the inmate may receive up to six sets of underwear, six pairs of socks, three pairs of scrubs, and two pairs of the canvas footwear in a six-month period. Thermal underwear is issued only to outside workers. If a request for personal hygiene supplies is approved, the inmate may receive two bars of soap per month, two disposable razors per month, two tubes of toothpaste per month and one toothbrush per quarter. Indigent inmates may mail three personal letters per week free of charge. No inmate receives deodorant, shampoo, shaving cream, tissues, aspirin, nonprescription cold remedies or writing materials. All of these items are, of course, available for purchase in the canteen. The record thus establishes that inmates who do not quality as indigent under the DOC standard receive some, but not all, necessary clothing free of charge and do not receive any of the supplies which are necessary to maintain a basic standard of personal hygiene. None of the intervenors qualified as indigent under the DOC standard.[10]
Based on the evidence introduced at trial, I find that, at the time their DNA samples were taken, intervenors White, Britto, Perry and Federici were indigent as defined in Section 27A and therefore ex *141 empt from paying DNA costs.[11] I find that Thomas, Barrows, Hill, Pina and Allen were able to pay a portion of the DNA fee without depriving themselves of the necessities of life at the time their DNA samples were taken.
D. The Commissioner’s Authority to Deduct Funds from Inmate Accounts
A survey of the statutes relating to inmate accounts establishes that where the Legislature has authorized prison officials to make deductions from inmate accounts, it has done so by statute and has specified the type of deduction and the source of funds from which authorized deductions may be taken. Equally significant, the Legislature has given the Commissioner limited authority to regulate in this area.
1. Statutes Authorizing Deductions from Inmate Earnings and/or Accounts[12]
Chapter 127, §3 provides that superintendents of all Massachusetts prisons “shall keep a record of all money or other property found in possession of prisoners committed to such institutions, and shall be responsible to the commonwealth for the safe keeping and delivery of said property to said prisoners” on their discharge. Section 3 requires the superintendents “upon receipt of an outstanding victim and witness assessment, [to] transmit to the court any part or all of the monies earned or received by any inmate and held by the correctional facility.” (Emphasis added.) Section 48A provides for the compensation of prisoners who perform work while incarcerated. The Commissioner is authorized to “establish a graduated scale of compensation” to be paid to the inmates and to establish, amend or annul “rules and regulations for carrying out the ■purposes of this Section.” Compensation may not be paid directly to an inmate, but the superintendent “may expend one half of the money so earned by any inmate on behalf of the inmate/or articles for the use of the inmate" (emphasis added).[13] Section 48A continues:
The superintendent shall also expend any part or all of such money of any inmate to satisfy the victim witness assessment ordered by a court pursuant to G.L.c. 258B, §8.[14] The remainder of the moneys so earned, after deducting amounts expended on behalf of the inmate as aforesaid, shall be accumulated to the credit of the inmate and shall be deposited in an interest bearing account by the superintendent as trustee in a bank approved by the state treasurer and paid to the inmate, with the accrued interest, upon his release from such institution in such instalments and at such times as may be described in such rules and regulations.
Said superintendent may also expend on behalf of any inmate such further sums from the money the inmate has earned upon the inmate’s written request and in circumstances of compelling need, including, but not limited to, expenses related to family illness or death, legal defense, provision of essential articles of personal use or any such circumstances of compelling need as determined by the superintendent.
Section 86F relating to work release programs in houses of correction contains similar detailed provisions relating to deductions which may be taken by the sheriffs from inmates’ earnings and requires that the balance “shall be credited to the account of the inmate and shall be paid to him upon his final release.” Section 86F provides in pertinent part:
The sheriff shall deduct from the earnings [of an inmate] delivered to him the following:
First, an amount necessary to satisfy the victim witness assessment ordered by a court pursuant to section eight of chapter two hundred and fifty-eight B; second, an amount determined by the sheriff for substantial reimbursement to the county for providing food, lodging and clothing for such inmate; third, the actual and necessary food, travel and other expenses of such inmate when released for employment under the program; fourth, the amount ordered by any court for support of such inmate’s spouse or children; fifth, the amount arrived at with public welfare departments; sixth, sums voluntarily agreed to for family allotments and for personal necessities while confined.
Finally, G.L.c. 124, §l(r) and (s), enacted in 2000, authorize DOC to deduct from an inmates’ account fees for haircuts and medical care received by the inmate as provided in G.L.c. 127, §48A, i.e., from monies earned by an inmate.[15]
2. Statutes Expressly Authorizing the Commissioner to Issue Regulations Relating to Deductions from Inmate Earnings/Accounts
Section 48 of Chapter 127 requires the commissioner to establish and maintain education, training and employment programs for inmates. It authorizes the commissioner to make and promulgate rules and regulations governing programs established under Section 48 which “shall include provisions for hours, conditions of employment, wage rates . . . and deductions from said wages pursuant to the provisions of Section eighty-six F.” Section 86F, quoted above, lists six specific deductions which sheriffs are authorized to make from inmate earnings.
In 1996, the Legislature enacted G.L. 127, Section 16A which expressly grants the Commissioner authority to include in regulations promulgated pursuant to Section 48 (relating to authorized deductions from earnings) provision for reimbursement of certain medical expenses: “The commissioner may include in the rules and regulations promulgated pursuant to the provisions of Section forty-eight provisions for the *142 reimbursement of medical expenses by persons incarcerated in department of correction pre-release facilities.” (Emphasis added.)
DISCUSSION
Regulations, like statutes, are entitled to a presumption of validity. Grocery Mfrs. of America, Inc. v. Department of Pub. Health, 379 Mass. 70, 75 (1979). But deference does not mean abdication. Smith v. Commissioner of Transitional Assistance, 431 Mass. 638, 646 (2000). An administrative agency hás only the powers and duties expressly conferred on it by statute and such as are reasonably necessary to carry out its mission. Morey v. Martha’s Vineyard Comm’n, 409 Mass. 813, 818 (1991). “An agency’s powers are shaped by its organic statute taken as a whole.” Greater Boston Real Estate Board v. Board of Registration of Real Estate Brokers & Salesmen, 405 Mass. 360, 363 (1989) (citingCommonwealth v. Cerveny, 373 Mass. 345, 354 (1977)). An administrative board or officer has no authority to promulgate rules and regulations which conflict with relevant statutes or exceed the authority conferred by statute. Morey, supra, 409 Mass. at 818; Telles v. Commissioner of Ins., 410 Mass. 560, 564-65 (1991). Where the Legislature has fully regulated a subject matter by statute, an agency cannot further regulate the topic by adopting a regulation which is contrary to the statute. See Massachusetts Hospital Ass'n., Inc. v. Department of Medical Security, 412 Mass. 340, 347 (1992).[16] ”[I]n assessing whether a regulation runs counter to statute, the court interprets the words used in the statute with regard both to their literal meaning and the purpose and history of the statute within which they appear. Smith, supra, 431 Mass. at 649.
Section l(q) contains a general grant of authority to the Commissioner which authorizes him to
make and promulgate necessary rules and regulations incident to the exercise of his powers and the performance of his duties including but not limited to rules and regulations regarding nutrition, sanitation, safety, discipline, recreation, religious services, communication and visiting privileges, classification, education, training, employment, care, and custody for all persons committed to correctional facilities.
For the following reasons, I find that the general grant of authority does not encompass authority for the Commissioner to promulgate regulations authorizing him to define indigence for purposes of assessing DNA costs or to deduct DNA assessment fees from inmate earnings or accounts.
First, Chapter 22E confers no such authority. Compare G.L.c. 258B, §8.[17] Chapter 22E authorizes the director of the crime lab within the Department of the State Police to promulgate regulations. Although the Legislature expressly recognized that many persons required to provide samples would be incarcerated at the time the sample was taken and correctional officers would play a r ole in the collection of DNA from inmates, see §4(a), the Act does not authorize the Commissioner to promulgate regulations concerning DNA collection or costs, to define indigence for purposes of assessing costs of collecting and processingDNA samples, or to impound and seize funds from inmate earnings and accounts to pay such costs.
Second, Chapter 22E, §4(b) provides that the definition of indigent in G.L.c. 261, §27A governs the determination of indigence for purposes of assessing DNA costs. The DOC standard of indigence is inconsistent with the statute.
Third, the Legislature has expressly regulated by statute the specific deductions which prison officials are authorized to make from inmate funds and identified the source of the funds from which deductions may be taken. Authorized deductions are specified in Sections 3, 48, 48A and 86F and G.L.c. 124, §l(r) and (s). None of these statutes contains language suggesting that the description or list of authorized deductions is nonexclusive. Section 3 of chapter 127 authorizes deduction of the victim witness assessment from monies earned or received by the inmate as provided in G.L.c. 258B, §8. Sections 48A and 86F authorize the Commissioner to make specified deductions from monies earned by the inmates. In Section 48A, the Commissioner is authorized to expend money earned by the inmate “for articles for the use of the inmate.” DNA assessment fees are not “articles for the use of the inmate." The six specific deductions which Section 86F authorizes sheriffs to make from earnings do not include DNA assessment fees. Subsections (r) and (s) added to Section 1 of Chapter 124 in 2000, immediately after the general grant of authority to regulate in subsection (q), authorize DOC to deduct from an inmates’ account fees for haircuts and medical care received by the inmate as provided in G.L.c. 127, §48A, i.e., from monies earned by an inmate.
Fourth, the Commissioner’s power to promulgate regulations relating to deductions from inmate accounts is the subject of specific grants of authority. Section 48 confers the power to issue regulations regarding inmate training and employment programs and wages therefrom, but limits such regulations to “deductions pursuant to the provisions of Section eighty-six F.” In my view, Section 48 confers no authority on the Commissioner to expand by regulation the deductions from earnings authorized by Section 86F.[18] It provides no authority for the Commissioner to promulgate regulations authorizing deductions from funds received by inmates, i.e., moneys not earned by inmates.
G.L.c. 127, §16A, enacted in 1996, expressly grants the Commissioner authority to include in regulations promulgated pursuant to Section 48A (relating to authorized deductions from earnings) *143 provision for reimbursement of certain medical expenses. If the general grant of authority in Section 1 (q) of chapter 124 encompassed authority to expand on statutorily authorized deductions by regulation, this express grant of authority would be superfluous.[19]
Fifth, the existence of such implied authority is inconsistent with the statutory scheme, designed to ensure that inmate property and earnings are safeguarded, see §3, and with the express language of Sections 3 and 48A requiring that the balance in an inmate’s accounts, after the statutorily authorized deductions are taken, be paid to the inmate upon discharge. See also §86F.
I further find that injunctive relief is warranted for the following reasons: (1) DOC is continuing to enforce the regulation and procedures notwithstanding that at least two judges of the Superior Court have ruled that the indigence provisions are in conflict with the express language of the statute; (2) the evidence presented at trial established that enforcement of the regulation is irreparably harming indigent inmates because the Commissioner is freezing their accounts and seizing their funds without authority, see, e.g. affidavit of Demond Perry[20] and testimony of Cedric White;[21] and (3) enforcement of the regulation has led to the filing of hundreds of civil cases and motions in criminal cases challenging the impoundment of accounts and seizure of funds to pay the DNA costs imposing a substantial burden on the Superior Court. See Smith, supra, 431 Mass, at 651-52 (propriety of granting injunctive relief against agency).
CONCLUSION
In view of the absence of any provision in the DNA Database Act granting such authority and the existence of a comprehensive statutory scheme, which encompasses an itemization of permissible deductions from inmate earnings and accounts and express limitations on the Commissioner’s authority to regulate in this area, authority to promulgate 103 C.M.R. §405.18 and the DNA Assessment Procedures cannot be implied. The regulation and procedures are ultra vires.
ORDER FOR JUDGMENT
For the reasons stated above, it is hereby ORDERED:
A. Judgment shall enter declaring that to the extent that it purports to authorize the Commissioner to define indigence for purposes of assessment of DNA costs and to deduct DNA costs from inmate accounts without consent, 103 C.M.R. §405.18 is ultra vires and void.
B. Judgment shall enter declaring that Department of Correction’s DNA Assessment Procedures are ultra vires and void.
C. The Department of Correction is enjoined from deducting DNA costs from wages earned by inmates or from any inmate account without consent and from freezing inmates’ accounts for any reason associated with the assessment of costs of collecting and processing DNA samples in the absence of a court order[22] or legislation expressly authorizing the seizure of the funds in question.[23] Unless stayed by order of the Appeals Court, the injunction shall take effect on April 6, 2001.
D. The Department of Correction is ordered to reimburse each of the intervenors $110.[24]

 Cedric White, Stephen Pina, Edmund Federici, Jeffrey Britto, Demond Perry, Mark Thomas, Michael Barrows, William J. Allen and Gerald Hill.

 At least two judges of this Court have concluded that DOC’s reliance on 405.18(2) and its DNA Assessment Procedures in determining indigence for purposes of assessing DNA costs violates G.L.c. 22E, §4(b). See Commonwealth v. Sargent, Memorandum of Decision and Order on Defendant’s Motion to Waive DNA Assessment Fees, Middlesex Sup.Ct. Crim. No. 91-3015 (Nov. 28, 2000) (Grabau, J.) (“The definition of indigence to be employed for purposes of waiving the cost of preparing, collecting and processing a DNA sample is found in G.L.c. 261, §27A . . . [T]he legislature failed to authorize the DOC to create ‘DNA Assessment Procedures’ or define ‘indigent’ in G.L.c. 22E, §4”); Winters v. Maloney, Middlesex Sup.Ct. No. 00-5098, 5361, Order on Applications for Preliminary Injunctions (December 15, 2000) (Neel, J.) (“Where the Commonwealth has failed to establish any basis upon which it may ignore the clear mandate of the statute regarding determination of indigence, the answer must be that an inmate who is indigent as defined by Section 27A may not be forced to contribute to ‘[t]he cost of preparing, collecting and processing a DNA sample’ ”).

 The parties have not briefed and the court has not considered the validity of other deductions from inmate accounts authorized by the regulation.

 In 1998, the director promulgated such regulations. See 515 C.M.R. §§1.01-1.06 (1998) (concerning the collection, submission, receipt, identification, storage and disposal of DNA samples); and 515 C.M.R. §2.01-2.16 (1998) (concerning the testing, analysis, quality assurance, computerized storage, retrieval and dissemination of the DNA database).

 The statute refers to §27H, which does not exist. Section 29, which concerns indigence of inmates, was added by the same amendments that added the reference to 27H to §27A.

 At the time of the first payment, the inmate must have a $100 average balance.

 Sneakers, thermal underwear and socks may be purchased in the canteen. These items are needed to go outside in the winter months. If family members send an inmate sufficient funds to purchase either a pair of sneakers or thermal underwear and socks, the inmate loses his status as indigent for sixty days.

 The relevant procedures are attached to the Russo affidavit.

 The Superintendent may designate an inmate as indigent if the inmate has less than in his account at the time of the request “or other circumstances [sic] as he deems appropriate.” There is no evidence in the record as to the frequency with which superintendents approve exceptions from DOC’s indigence standard.

 Although the procedures state that an inmate whose account is frozen pursuant to the DNA Assessment Procedures will receive indigent clothes and supplies, intervenor White testified that he submitted several requests for personal *144 hygiene supplies and several requests for clothes while his account was frozen and received no response.

 After this suit was filed, DOC reimbursed the plaintiff Welsh the $110 taken from his account.

 DOC cites the following statutes as authority for the promulgation of 103 C.M.R. §405.18: G.L.c. 22E, §4, G.L.c. 124, §l(q), and G.L.c. 127, §§3, 48,48A, 49,96 and 162. Apart from G.L.c. 124, §l(q), the general grant of authority, discussed infra, none of the cited statutes supports DOC’s authority to issue a regulation defining indigence for purposes of G.L.c. 22E or authorizing the Commissioner to seize funds from inmate accounts without consent to pay DNA costs. As demonstrated in the text, nothing in Sections 3, 48 and/or 48A supports the proposition that the Commissioner has authority to enlarge upon the deductions from inmate accounts expressly authorized by statute. Section 49 concerns outside employment and contains no authorization for deduction from inmates’ earnings or accounts. I ássume that DOC intended to cite §96A, not §96 which has been repealed. Section 96A relates to the disposition of unclaimed money of former prisoners. Section 162 provides for the payment of not more than $50 from the treasury of the institution to each prisoner leaving the institution. The DOC also relies on Executive Order 399 issued on August 12, 1997. That order prohibits prisoners from raising money for political purposes.

 In the case of certain inmates, including those serving life sentences, the superintendent “may so expend” any part or all of such money.

 This sentence was added to the statute in 1994. In an apparent scrivener’s error the same sentence is repeated at the end of the second full paragraph of §48A.

 Sections 29(d)(3) and (4) of G.L.c. 261 also authorize the superintendent to withdraw funds from inmate accounts for the payment of court fees, but only upon written request by the inmate.

 Relying on Grocery Mfrs. of America, Inc., supra, 379 Mass. at 76, DOC argues that the fact that various sections of a statute grant the department authority to prescribe regulations in great detail on particular subjects does not limit the department’s authority to deal with other matters under more general statutory guidelines. In this case, the detailed statutory authorization concerns the same subject matter as the regulation in question, namely, prison officials’ authority to deduct money from inmates’ earnings and accounts.

 Chapter 258B, §8, as amended in 1994, provides in pertinent part:
If the person convicted is sentenced to a correctional facility in the commonwealth, the superintendent or sheriff of the facility shall deduct any part or all of the monies earned or received by any inmate and held by the correctional facility, to satisfy the victim witness assessment, and shall transmit such monies to the court monthly.
The statute also gives the victim witness assessment priority over other assessments.

 One might argue, with respect to deductions from earnings, that the Legislature simply intended to mandate that the deductions listed in Section 86F be included in the regulations promulgated pursuant to Section 48 and did not intend to limit the Commissioner’s authority to expand the list of permissible deductions. Had the Legislature so intended, however, it would likely have described the deductions as “including” those listed in Section 86F. Moreover, that interpretation is inconsistent with Sections 3, 48A and 86F which provide that, after specified deductions are taken, the balance shall be the property of and returned to the inmate on discharge.

 If the purpose of Section 16A was to require the Commissioner to exercise a grant of authority previously given. the Legislature would have used mandatory language, instead of the permissive “may include.”

 Perry was convicted in April of 2000. On May 5, 2000, Perry spent $277.34, on various items, including a television, leaving $4.87 in his personal account. Perry’s DNA was taken on September 20, 2000. Perry was employed in the kitchen from June through August 2000. He earned $9.00 per week for six days’ work. Half of that amount, $4.50, was deposited in a savings account to which Perry, who is not serving a life sentence, does not have access. From August through December 2000, Perry worked as a runner in the prison. He made $7.00 per week of which $3.50 was deposited in his savings account. In the sixty days preceding September 20, 2000, the maximum amount in Perry’s personal account was $11.45. Perry’s personal account was frozen on September 27, 2000. As of February 21, 2001, Perry’s account was still frozen. Between September 27 and February 21, Periy could not purchase soap, deodorant, toothpaste, stamps, writing materials, clothes and other necessities. Perry submitted requests for indigent supplies, but received no response.

 White was convicted on April 11, 2000. His DNA was taken on May 3, 2000. On that date he had $100.30 in his account at the House of Corrections which was subsequently transferred to his prison account. Apart from a Walkman purchased on September 27, 2000, which cost about $28, White used these funds to buy basic necessities after he was transferred. He has no other resources. On September 28, 2000, White's personal account was frozen. Between August, when he arrived at SBCC, and January 11, 2001, White was on a waiting list for a job. Since January 11, 2001, he has worked in the prison library. He works six days per week and is paid $5.00, of which $2.50 is deposited in his savings account. On September 15, 2000, White’s sister, a single mother with four children, sent him a gift of $60. On October 3, 2000, an uncle sent White $30. White’s account remained frozen until his father, who is on a fixed income, sent him money to pay the DNA assessment fee. On February 8, 2001, DOC deducted $ 110 from White’s account and White was able to access the remaining funds to purchase necessities from the canteen. While his account was frozen, White submitted several requests for clothes and personal hygiene supplies. He received no response.

 There is no evidence that any court ordered the collection of DNA from the plaintiff or any intervenor or that any court ordered the payment of DNA collection costs by any of the inmates in this case. I therefore have not addressed the question whether the court has the power to authorize the seizure of funds from the account of an inmate who is not indigent for the purpose of paying DNA collection costs.

 Should the Legislature act, it will have the opportunity to address (a) whether, as a matter of policy, the deduction should be from gifts received by an inmate from family members and friends, that enable inmates to purchase necessities which are not provided by DOC, as well as from amounts earned by inmates; and (b) the desirability of minimizing the burden and expense of judicial proceedings to determine indigence by clarifying the indigence definition as applied to inmates and establishing a procedure for administrative review of the indigence determination before suit challenging a DNA assessment is authorized. Requests for administrative review by plaintiff in this case were denied because “it’s a legal matter.”

 The Department reimbursed plaintiff Welsh after this suit was brought.