COMMONWEALTH *vs.* WILLIAM J. CERVENY & others.[1]

Hampden.    May 2, 1977. — September 14, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Perjury. False Pretenses. Larceny. Practice, Criminal,* Directed verdict, Duplicitous convictions, Mistrial. *Jury and Jurors. Regulation. Administrative Agency. Words,* "Required by law."

At the trial of an indictment for perjury under G. L. c. 268, § 1A, against an individual, and of indictments against four corporations providing health services for falsifying information filed with the Rate Setting Commission, in violation of G. L. c. 7, § 30N, as appearing in St. 1968, c. 492, § 3, there was no error in the denial of motions for directed verdicts where there was evidence that through a holding company the individual defendant owned and controlled the four corporations, that he signed annual reports of their operation under penalties of perjury on forms required by the commission's regulations incorporating a form setting out the declaration to be subscribed, and that he manipulated checking accounts so that the annual reports of the corporations showed sums as equity cap-

---

[1] The four corporations mentioned in the text.

ital, an element on which the per diem rate payable to them for care to "Medicaid" patients was based, which properly should have been shown as "intercompany" accounts not comprising equity capital; there was no merit in claims that the check manipulation was harmless, that the falsehood was not "material," or that no "law" required the declarations in the reports to be made under the penalties of perjury. [351-354]

Upon a sentence for perjury under G. L. c. 268, § 1A, based on the defendant's making false statements for financial gain, and upon his sentence for attempted larceny by false pretenses under c. 274, § 6, based on the same false statements, the attempted larceny sentence to be served "from and after" the perjury sentence, this court decided that in the unusual situation presented the lesser sentence for attempted larceny must be struck, and judgment of conviction thereon reversed and the verdict set aside. [354-356]

Exceptions, taken at the empanelment of a jury, to the denial of motions that probation reports of prospective jurors in the hands of the prosecution be made available to the defendants were without merit where the probation office made the reports available the next day. [356-357]

There was no error at a lengthy trial of indictments involving voluminous records of the defendant corporations in the denial of motions for mistrial based on references to an independent investigation about possible "fraud" by the corporations where the judge adequately cured any possible prejudice. [357-358]

There was no error in the denial of motions by the Commonwealth and the defendants for mistrial with respect to indictments against nursing home corporations and the individual owning and controlling them, based on the fact that a patient in one of the defendant corporations was the mother of the chief court officer and the grandmother of a subordinate officer in charge of the jury pool, where this court could not declare to be plainly wrong the trial judge's opinion that there was no likelihood that the officers had conveyed anything to a juror which might influence his vote. [358-359]

SIXTEEN INDICTMENTS found and returned in the Superior Court on November 12, 1974, and February 7, 1975.

The cases were tried before *Tisdale*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Francis J. DiMento* (*Thomas C. Cameron* with him) for the defendants.

*Henry A. Moran, Jr.*, Special Assistant District Attorney, for the Commonwealth.

KAPLAN, J.    A Hampden County jury found the defendant William J. Cerveny guilty on five indictments

charging perjury by written instrument,[2] and on four indictments charging attempted larceny by false pretense.[3] They found Valley View Nursing Home, Inc., guilty on three indictments charging that, as a health provider, it falsified information required to be filed with the Rate Setting Commission;[4] West Springfield Nursing Home, Inc., guilty on two indictments with similar charges; and Ridgeview Nursing Home, Inc., and Eldercare Nursing Home, Inc., each guilty on one indictment. Cerveny was sentenced to concurrent terms on the perjury convictions, and concurrent terms, to be served "from and after," on the convictions of attempted larceny.[5] The corporate code-

---

[2] Under G. L. c. 268, § 1A, as amended by St. 1947, c. 106: "No written statement required by law shall be required to be verified by oath or affirmation before a magistrate if it contains or is verified by a written declaration that it is made under the penalties of perjury. Whoever signs and issues such a written statement containing or verified by such a written declaration shall be guilty of perjury and subject to the penalties thereof if such statement is wilfully false in a material matter."

[3] General Laws c. 274, § 6, provides: "Whoever attempts to commit a crime by doing any act toward its commission, but fails in its perpetration, or is intercepted or prevented in its perpetration, shall, except as otherwise provided, be punished as follows: ... Fourth, by imprisonment in a jail or house of correction for not more than two and one half years or by a fine, or by both such fine and imprisonment, if he attempts to commit any larceny punishable under said section thirty [c. 266, § 30]."
General Laws c. 266, § 30 (1), as amended by St. 1968, c. 737, § 10, provides: "(1) Whoever steals, or with intent to defraud obtains by a false pretense, or whoever unlawfully, and with intent to steal or embezzle, converts, or secretes with intent to convert, the property of another as defined in this section, whether such property is or is not in his possession at the time of such conversion or secreting, shall be guilty of larceny . . . ."

[4] General Laws c. 7, § 30N, as appearing in St. 1968, c. 492, § 3, provided in part: "Any provider of health services which knowingly fails to file with the commission data, statistics, schedules or other information required pursuant to this section or by any regulation promulgated by the commission or which knowingly falsifies the same shall be punished by a fine or not less than one hundred nor more than five hundred dollars." (See now c. 6A, § 35.)

[5] Five concurrent terms of from twelve to fifteen years on the perjury convictions, and four concurrent terms of eighteen months on the at-

fendants received fines on their several convictions. The defendants named have appealed pursuant to G. L. c. 278, §§ 33A-33G.

The charges and convictions sprang from the submission to the Rate Setting Commission of certain annual reports of the operations of the corporations — three nursing homes and one rest home — signed by Cerveny under penalties of perjury, and alleged to contain material falsehoods. The reports, on "Form RSC-1," were for Valley View and West Springfield for the year 1971; for Valley View for 1972; and for all four corporations for 1973. These reports were intended for use by the commission in fixing the per diem rates at which the corporations would be compensated by the Department of Public Welfare for the care they provided to patients publicly assisted under "Medicaid."

Although the trial was protracted, it is possible to state the main facts and pose the chief legal questions quite briefly.

Through holding company ownership, Cerveny owned and controlled the four defendant corporations, all doing business in the Springfield-Westfield area. Cerveny dominated the affairs of the entities as the principal operating officer of each.

The RSC-1 report form, usually filed in March, reflected the operations of the home for the preceding calendar year; included was a balance sheet as at December 31. Detailed regulations of the Rate Setting Commission, which referred to and incorporated the form, defined the terms of the form and otherwise prescribed how it was to be filled out.

Examining the regulations including the form, we can say roughly that four factors entered into the rate: allow-

---

tempted larceny convictions. The Appellate Division of the Superior Court reduced the perjury sentences to two and one-half years.

Cerveny was acquitted by the jury on an indictment charging a larcenous scheme.

The jury acquitted a codefendant, Howard Keeler, on four indictments for attempted larceny.

ances for operating expenses, for administration, for inflation (a cost adjustment factor), and for average equity capital. The latter permitted a return to the owner on his investment: if the home were run on borrowed money, interest thereon would be an allowable expense reimbursed through the rate setting process; it was conceived that where the owner was using his own money he was entitled to a counterpart allowance. "Average" meant essentially the average of the differences between assets and liabilities at the beginning and the end of the year. In the list of items which might or might not figure in average equity capital, we have to note particularly two exclusions: "inter-company accounts" (including those between parent and subsidiary); and assets not directly related to or necessary for the provision of care to publicly aided patients (excessive cash would be an example).

The prototypical transaction carried out by Cerveny which placed the defendants in the dock was designed artificially to increase "cash on hand or cash in the bank" and thus to increase equity capital as an element on which the per diem rate was calculated. The holding company owed a nursing home a substantial amount of money as the result of a loan (which we may assume to have been real). Properly, this would show up as an inter-company account and could not be treated as an asset of the home in calculating equity capital. On December 31 of a given year, Cerveny would cause the holding company to draw a check on its bank in favor of the home in the amount of the loan. In fact the holding company had no or a very small balance in its account in the bank. The check was posted as a credit to the home and was reflected in "cash on hand or cash in the bank" as at December 31 on the balance sheet part of the RSC-1 form submitted. On January 2 or 3[6] the home drew its check on the same bank in favor of the holding company in an equivalent amount,

---

[6] Note that the scheme had the effect of artificially increasing cash for the start of a year as well as the preceding year-end.

thus in effect reinstating the loan. It was important to the particular scheme that the holding company's check should not be recognized and dealt with as an overdraft — returned for insufficient funds — until it was neutralized, so to speak, by the equivalent check of the home. This was accomplished by an understanding with a complaisant employee of the bank at which all the corporations maintained their accounts. (A total of over three-quarters of a million dollars was nominally paid and lent back in this manner by the holding company and the four corporations in the end 1973 transactions.)

There was proof of how an RSC-1 report usually would be treated when received by the Rate Setting Commission. It was given an initial screening, often by a person without a background in accounting, to check surface computations. An accountant then performed a "desk audit," i.e., an examination of the items to see whether they conformed on their face with regulations: for example, whether a maximum permitted for automobile expenses had been exceeded. These accountants — there were approximately three such accountants to examine more than 750 annual reports — did not attempt to check on the accuracy of the figures reported. At this stage the interim rate was computed, applying to the second year following the year covered by the report (thus a 1974 rate based on the 1972 year-end report).

Later, usually much later, a "field audit" was scheduled: one or two field auditors actually visited the home and sought to verify the figures. Again, time pressure could be anticipated as all the work was done by eight or nine field men. The results of the field audit were reviewed by higher authority, leading to a commission vote on the final rate. Adjustments would be made for any difference between the interim and final rates. Usually the final rate would be determined long after payments were received at the interim rate. If the interim payments turned out to be excessive, the home was obliged to compensate the Commonwealth, but it appears that no interest would be charged for the use of the money to which, strictly, the home had not been entitled.

We take up Cerveny's exceptions. No separate treatment is needed of the appeals of the corporations.[7]

1. *Denial of directed verdicts of acquittal.* (a) Preliminary. With respect to the claimed error in the judge's refusal of motions for directed verdicts at the close of the Commonwealth's case and at the close of all the evidence, it may be noted, first, that the defense has not pursued in this court the point made during trial that the contrivances with the checks and the filling out of the forms were all a means of making a test case about the legality of the commission's regulations, presumably on the subject of inter-company accounts. The defense never defined just what this question could be; nor was any explanation offered why procedures appropriate for making such a legal test were conspicuously avoided.

As if to trivialize the wrong, if there was one, the defense seeks to make it appear that the only complaint was that the holding company's check was not backed up by funds. But the legal position could be the same if the holding company momentarily had had sufficient money in the bank: if (for example) it had borrowed on December 30 from an outside source for a period of a few days an amount equal to the loan from the nursing home, used the borrowed money to pay that loan on December 31, and then had the home reconstitute the loan in the same amount on January 2 to enable the holding company to discharge the temporary loan. An RSC-1 report showing the cash would still be false in substance where the "wash" was planned from the beginning and calculated corruptly to raise the rate.

(b) Materiality. There is argument that the falsehood was not "material," an element of the offense of perjury under G. L. c. 268, § 1A (text at note 2 *supra*);[8] that the

---

[7] The brief for the defendants does not make a separate argument for the corporations. "Materiality," point 1 (b) below, might have an analogical bearing on the sufficiency of the evidence against the corporations; and points 3-5 would apply to the corporations.

[8] It is also argued, and we think correctly, that "materiality" would likewise play a part in proving the offense of attempted larceny by false pretense.

balance sheet, as reported, would still call on its face for disallowance of the amount added to cash because it would necessarily represent excessive cash for the nursing home. Not so; whether the amount would appear in fact excessive could well turn on how liquid the home happened to be at the time. Further, there was no commission rule in force by which an accountant could decide automatically or readily what cash was excessive and therefore to be eliminated from equity capital. Cerveny, then, could count on the blandness of the item as reported, together with the inefficiency and slowness of the examining process at the commission, to give the entire item (or possibly some reduced sum) a good chance to get by without suspicion. In lieu of an "inter-company account" on the report easy to see and eliminate as an asset by rule of thumb, Cerveny substituted a seemingly acceptable asset whose falsity could be discovered, if at all, only after substantial investigative effort.

Cerveny's statements on the forms were thus false "in a material matter" in the meaning of the statute. As we said in *Commonwealth* v. *Giles,* 350 Mass. 102 (1966), interpreting cognate language of G. L. c. 268, § 1: "Materiality in respect of perjury means relevance in the sense that the answer might tend in reasonable degree to affect some aspect or result of the inquiry"; and again, "the test of relevancy and materiality is not whether the false testimony did in fact influence a pertinent determination. Instead, it must be decided whether, viewed objectively, the testimony directly or circumstantially had a reasonable and natural tendency to do so." *Id.* at 110, 111. See *United States* v. *McFarland,* 371 F.2d 701, 703 (2d Cir.), cert. denied, 387 U.S. 906 (1966); *United States* v. *Marchisio,* 344 F.2d 653, 665 (2d Cir. 1965). For instances of immateriality, contrasting with the present facts, see *Commonwealth* v. *Louis Constr. Co.,* 343 Mass. 600, 606-607 (1962); *United States* v. *Beer,* 518 F.2d 168, 171-173 (5th Cir. 1975).

(c) *Required by law.* As an alternative reason for claiming error in the denial of directed verdicts of acquit-

tal of the perjury charges, Cerveny says the reports as signed by him "under penalties of perjury"[9] were not the kind of statements intended by the penal statute, G. L. c. 268, § 1A. Cerveny reads the statute as reaching only those written statements which, besides being required by law to be submitted, are required by law to refer to penalties of perjury. We accept this reading although a harsher one is possible.

While Cerveny seems prepared to grant that the forms were required by "law" to be submitted because proper regulations of the Rate Setting Commission called for them, he professes to find no "law" that required the declaration as to penalties of perjury. But the regulations that required the submission of the form incorporated the form which set out the declaration to be subscribed. The regulations should be taken as "law" requiring subscription to that declaration, unless, indeed, there was something in the statute describing the powers of the Rate Setting Commission that stood in the way. On the contrary, the statute in force at the time, St. 1968, c. 492, § 3, codified at G. L. c. 7, empowered the commission to determine rates and to "promulgate rules and regulations for the administration of its duties and the determination of rates" (c. 7, § 30L; see now G. L. c. 6A, § 32). As a condition of reimbursement, providers of health services were required to "file with the commission from time to time, or on request, such data, statistics, schedules or other information as it [the commission] may reasonably require" and to "permit the commission, or any designated representative thereof, to examine such books and accounts as may reasonably be required for it to perform its duties" (§ 30N; see now c. 6A, § 35). And the commission was authorized to "summon witnesses, administer oath and require the

---

[9] The statement on the form preceding the signature was as follows: "Under penalties of perjury, I declare that the foregoing report, including any attached schedules, has been examined by me and is a true and complete statement of the information required. If prepared by a person other than owner, partner or officer, his declaration is based on all information of which he has any knowledge."

production of books, records and papers at any hearing before the hearing officer [on appeal questioning a rate set by the commission], upon any matter within its jurisdiction" (§ 30P; see now c. 7, § 4H).

These statutory provisions did not in terms delegate a power to require a declaration about penalties of perjury, but they were ample enough to imply it; indeed nothing would be more natural for a commission with rate setting functions. An agency's powers are shaped by its organic statute taken as a whole and need not necessarily be traced to specific words. See *Warner Cable of Mass. Inc.* v. *Community Antenna Television Comm'n*, 372 Mass. 495, 504-505 & n.17 (1977). Nor could Cerveny, signing the reports with the declaration, complain of lack of notice that his falsehoods might be punishable. The precise question of regulations as "law" for the particular purpose has not arisen before (cf. *Assessors of Boston* v. *Neal*, 311 Mass. 192, 201 [1942]); but *Commonwealth* v. *Weene*, 319 Mass. 231 (1946), decided under an earlier text of § 1A, seems congenial to the result we reach. *Commonwealth* v. *Giles*, 350 Mass. 102 (1966), is also instructive on the implication of powers to require an oath. And see *Avery* v. *Ward*, 150 Mass. 160, 162-163 (1889). Our conclusion finds support in such cases as *United States* v. *Hvass*, 355 U.S. 570, 574-578 (1958); *Boehm* v. *United States*, 123 F.2d 791, 800-801 (8th Cir. 1941), cert. denied, 315 U.S. 800 (1942); *People* v. *Ziady*, 8 Cal. 2d 149, 157-158 (1937).

2. *Multiple prosecutions and punishments.* Cerveny received a sentence for attempted larceny, as well as a sentence for perjury, based on the false statements on each of the four reports submitted by the corporations respectively for the year 1973. By appropriate motions and exceptions Cerveny protested the multiple prosecutions resulting in multiple sentencing. In the unusual situation presented here, we are persuaded that Cerveny should be relieved of the four sentences for attempted larceny (ordered to be served concurrently with each other, but collectively from and after the perjury sentences). The four sentences for perjury will stand, together with the fifth on

which there was no corresponding charge of attempted larceny (all five ordered to be served concurrently). This result is reached without deviating from a "same evidence" rule to which this court has long adhered.

"A single act may be an offence against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." *Morey* v. *Commonwealth,* 108 Mass. 433, 434 (1871). See *Kuklis* v. *Commonwealth,* 361 Mass. 302, 306 (1972); *Brown* v. *Ohio,* 432 U.S. 161 (1977). See also *Gallinaro* v. *Commonwealth,* 362 Mass. 728 (1973). Cf. *Commonwealth* v. *Gallarelli,* 372 Mass. 573 (1977).[10]

We note, then, the elements of each offense: To convict of perjury under G. L. c. 268, § 1A, the Commonwealth must show that the defendant signed a written statement required by law (see point 1 [c] above) to be issued and to be verified by a declaration regarding perjury (or by oath or affirmation before a magistrate), and that he in fact issued and so verified it, and that the statement was wilfully false in a material matter, meaning by the latter phrase that it had a tendency to induce action by the addressee (see point 1 [b] above). To convict of larceny by false pretense (G. L. c. 266, § 30 [1], text at note 3 *supra*), the Commonwealth must prove that the defendant wilfully made a false statement intending the addressee to rely on its truth, and that the addressee did so rely and in consequence parted with personal property. See *Commonwealth* v. *Leonard,* 352 Mass. 636, 645 (1967). See also *Commonwealth* v. *Hamblen,* 352 Mass. 438, 442 (1967); *Commonwealth* v. *Kiernan,* 348 Mass. 29, 46 (1964), cert. denied sub nom. *Gordon* v. *Massachusetts,* 380 U.S. 913 (1965); *Commonwealth* v. *Louis Constr. Co.,* 343 Mass. 600, 604-605 (1962). An attempt looks to a purpose to

---

[10] In the *Gallarelli* case, two members of the court expressed dissatisfaction with the "same evidence" approach as applied to the question of the joinder of offenses for trial. See the concurring opinion at 580.

commit the crime and the doing of an act toward its commission but failing or being intercepted or prevented in its perpetration (G. L. c. 274, § 6, text at note 3 *supra*). Subject to two questions to be considered, it would appear on comparison that the attempted larceny by false pretense has no element in addition to those enumerated for the perjury.

The first question arises from the fact that it need not be an object of the perjury to gain a financial advantage, as it must be for larceny; other objects may do. But in the present context we think it sufficient that in fact the purpose of the perjury was financial gain. The second question stems from the fact that the larceny requires an intent to have another rely on the pretense. The like element is not always included expressly in formulations of perjury, although often it is.[11] However, the concept of "materiality" already comprises that element or something quite close to it; and here the judge concluded his instructions on perjury by saying "a person knowing his statements are not true intentionally adopts the course of action to induce another to accept such statements as true." We conclude on the whole that the multiple punishments should be disallowed.

The sentences for attempted larceny are to be struck as that crime is punishable less severely than the perjury. See *Kuklis* v. *Commonwealth, supra* at 309.

3. *Probation reports of jurors.* As empanelment of the jury began, counsel for a codefendant (acquitted below, see note 5 *supra,* last paragraph) observed that the prosecutor had in hand probation reports of the prospective jurors. Counsel moved that these reports be made available to him, and counsel for the present defendants joined in the motion and sought the same access. The judge denied the motions, and exceptions were taken. We need not enter here on the extent of the prosecutor's duty to furnish opposing counsel with such material nor on the

---

[11] As in *Beckanstin* v. *United States,* 232 F.2d 1, 4-5 (5th Cir. 1956); *United States* v. *Rose,* 215 F.2d 617, 622-623 (3d Cir. 1954).

problem of showing prejudice in case of a wrongful with-holding. Cf. *Commonwealth* v. *Smith,* 350 Mass. 600, 603 (1966) (police investigative reports on jurors to be furnished to defendant; discussion of prejudice issue). Next day the probation office passed the probation reports to counsel for the codefendant, and it appears from the record that they were either also provided to counsel for the defendants or were known by him to be forthcoming on his simple request. The exceptions have no merit.

4. *References to independent investigation.* The defendants have preserved exceptions to the denial of three motions for mistrial based on references in the course of trial to an investigation of the corporations conducted by employees of the bureau of welfare auditing[12] (a "fraud squad"). These references occurred when, on redirect examination of a principal witness for the Commonwealth, he explained that the usual "exit" conferences between the field auditors and the staff of the homes had been omitted as inappropriate because the Rate Setting Commission was consulting with the bureau's investigators; again in connection with the Commonwealth's offer of a report of the senior accountant of the commission (which was in fact excluded); and a third time, when a Commonwealth witness, testifying about his interview with an official of the bank, stated that he had first exhibited his credentials and that his position (evidently shown on the credentials card) was fraudulent claims investigator for the bureau. On the first occasion the judge struck the particular answer and instructed the jury to ignore such remarks in deciding guilt or innocence, and on the third he instructed the jury again in the same sense.

The defendants take too serious a view of the remarks objected to. We doubt that in a lengthy trial involving voluminous corporate records a jury would be overborne by learning, without artificial emphasis on the matter by the prosecution, that there had been an independent investigation about possible "fraud." In all events there was

---

[12] See G. L. c. 7, § 30R.

action by the judge that we consider adequately curative in the circumstances. See *Commonwealth* v. *Sandler,* 368 Mass. 729, 734-735 (1975).

5. *Behavior of court officers.* After both sides had rested and defense counsel had addressed the jury, the Commonwealth moved for a mistrial with representations as follows. The chief court officer and a subordinate in charge of the jury pool were uncle and nephew. The former's mother (the latter's grandmother) was a patient in one of the accused nursing homes. There was reason to believe that the junior officer had remarked while the trial was in progress, once to an investigator for the bureau of welfare auditing, and again to a newspaper reporter, that he did not think the amount allegedly stolen by Cerveny justified the expense of the prosecution. Further, at lunchtime on the day of the motion, a juror was seen to approach the two officers at a restaurant and speak with them for perhaps two minutes. The Commonwealth suggested that the prosecution might have been prejudiced. The defense joined in the motion for mistrial.

On voir dire examination of the court officers (after Miranda warnings), both denied having made any substantive mention of the case to any juror. The junior officer remembered talking to the investigator somewhat in the sense indicated. He said the lunchtime conversation with the juror was about where the jury were to stay if locked up. The senior officer said the juror also inquired when they would be sent out to deliberate. The officers did not think themselves disqualified by their relative's residence at the nursing home.

On this showing the Commonwealth did not insist on its motion. After removing the two officers from the case and ordering the jury locked up so that they would not encounter news reports of the mistrial motion, the judge allowed the case to go forward and denied the motion, to which the defendants excepted. There was no error. The officers should have disclosed the connection to the nursing home and refrained from making any comment about the case to anyone. The question, however, was whether there

was a likelihood that they had conveyed anything to any juror that might influence his vote. This was largely a question of fact for the trial judge on the scene, and we should be chary of holding that his negative opinion in the present case was plainly wrong. See *Commonwealth* v. *Caine,* 366 Mass. 366, 372 (1974); *Commonwealth* v. *Charland,* 338 Mass. 742, 745-746 (1959); *Claffey* v. *Fenelon,* 263 Mass. 427, 434-435 (1928). We should add that the judge's instructions cautioned the jury to stick to the evidence produced in court. Cf. *Commonwealth* v. *Curry,* 368 Mass. 195, 201 (1975).

The judgments of conviction of Cerveny of attempted larceny are reversed and the verdicts set aside; the other judgments of conviction are affirmed.

*So ordered.*