411 Mass. 183                                                183

Massachusetts Municipal Wholesale Electric Co. *v.* Energy Facilities Siting Council.

MASSACHUSETTS MUNICIPAL WHOLESALE ELECTRIC
COMPANY *vs.* ENERGY FACILITIES SITING COUNCIL.

Suffolk. September 10, 1991. - November 12, 1991.

Present: LIACOS, C.J., LYNCH, O'CONNOR, & GREANEY, JJ.

*Administrative Law*, Judicial review, Regulations, Agency, Agency's inter-
    pretation of statute, Agency's interpretation of regulation, Agency's au-
    thority, Substantial evidence. *Statute*, Construction. *Regulation. Elec-
    tric Company.. Energy Facilities Siting Council.*

Where certain orders contained in a decision of the Massachusetts Energy
    Facilities Siting Council were part of the decision from which the Mas-
    sachusetts Municipal Wholesale Electric Company, a public corpora-
    tion existing under St. 1975, c. 775, appealed, it was appropriate that
    this court decide the validity of the orders at the time of this appeal by
    determining the council's authority under its enabling legislation. [188]
On appeal from a final decision of the Massachusetts Energy Facilities
    Siting Council (council) rejecting, in part, the Massachusetts Munici-
    pal Wholesale Electric Company's (MMWEC's) long-range forecast of
    electric power needs in its market area and ordering MMWEC in the
    future to submit individual member forecasts as part of its long-range
    forecast, this court concluded that MMWEC fulfilled its statutory obli-
    gation by filing a joint long-range forecast with the council on behalf of
    its members; that the MMWEC members fulfilled their statutory obli-
    gation by participating with MMWEC in a jointly filed long-range
    forecast; and that neither MMWEC nor any of its members must sepa-
    rately state or file "historical sales and demand or sendout data and
    forecast levels." [188-192]
The Massachusetts Energy Facilities Siting Council (council) did not have
    authority, pursuant to its enabling legislation (G. L. c. 164, §§ 69H-
    69R), to issue prospective orders as part of its decision rejecting, in
    part, the Massachusetts Municipal Wholesale Electric Company's
    (MMWEC's) long-range forecast of electric power needs in its market
    area and purporting to require MMWEC in the future to submit indi-
    vidual member forecasts as part of its long-range forecast. [192-197]
In proceedings before the Massachusetts Energy Facilities Siting Council
    (council) with regard to a long-range forecast filed by the Massachu-
    setts Municipal Wholesale Electric Company (MMWEC), there was

substantial evidence to support the council's decision rejecting the supply plan portion of MMWEC's forecast. [197-201]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on March 9, 1990.

The case was reported by *Nolan*, J.

*Robert M. Granger* (*Nicholas J. Scobbo, Jr.*, with him) for the plaintiff.

*William W. Porter*, Assistant Attorney General, for the defendant.

LYNCH, J. The Massachusetts Municipal Wholesale Electric Company (MMWEC)[1] appeals from a final decision of the Massachusetts Energy Facilities Siting Council (council)[2] rejecting, in part, MMWEC's long-range forecast and ordering MMWEC in the future to submit individual member forecasts as part of its long-range forecast. MMWEC also seeks to strike certain orders and findings contained in the decision. A single justice reserved and reported the case without decision to the full court. We conclude that the council cannot order MMWEC to submit individual member forecasts as part of its long-range forecast. We also conclude that the council's decision rejecting the supply plan portion of MMWEC's forecast is supported by substantial evidence. We therefore affirm the council's decision in part and reverse in part.

---

[1]MMWEC, a public corporation, is a joint planning and action instrumentality established in 1975 for the purposes of financing the purchase of electric power by utilities within and outside Massachusetts. See St. 1975, c. 775, §§ 2 & 5. Its membership consists of cities and towns in Massachusetts having municipal electric departments.

[2]The council is a State agency composed of the secretaries of four executive offices or their respective designees and six other individuals, appointed by the Governor. The powers, duties, and responsibilities of the council are set forth in G. L. c. 164, §§ 69H-69R (1990 ed.). The background details and an analysis of a recommended siting bill, which, with minor revisions, was enacted as §§ 69G-69R of c. 164, can be found in Third Report of the Massachusetts Electric Power Plant Siting Commission, 1973 House Doc. No. 6190.

411 Mass. 183                                                   185

Massachusetts Municipal Wholesale Electric Co. *v.* Energy Facilities Siting Council.

Every electric company periodically must file with the council "a long-range forecast with respect to the electric power needs and requirements of its market area . . . for the ensuing ten-year period." G. L. c. 164, § 69I (1990 ed.). An electric company may file its forecast individually or jointly with others. G. L. c. 164, § 69I.

A long-range forecast has two major parts: (1) the demand forecast, and (2) the supply plan. See G. L. c. 164, § 69I, second par.; 980 Code Mass. Regs. §§ 7.03, 7.04 (1986). The demand forecast is a projection of the future electric power needs within a company's market area. G. L. c. 164, § 69I, second par. (2). 980 Code Mass. Regs. § 7.03. The supply plan describes the actions a company plans to take to meet such needs. G. L. c. 164, § 69I, second par. (3). 980 Code Mass. Regs. § 7.04.

The council must conduct a public hearing on each long-range forecast within six months of its filing. G. L. c. 164, § 69J, first par. After holding a public hearing, the council reviews the long-range forecast to determine whether it meets certain requirements and whether the supply plan is consistent with the health, energy, environmental protection, and economic policies of the Commonwealth. G. L. c. 164, § 69J. 980 Code Mass. Regs. §§ 7.03 (1), 7.04 (1) (b). If the forecast meets the statutory requirements, the council must approve the forecast. G. L. c. 164, § 69J, third par. If the requirements are not met, the council may reject the forecast, in whole or in part, or approve the forecast, subject to stated conditions. *Id.*

1. *Procedural background.* On August 1, 1988, MMWEC filed a joint long-range forecast with the council on behalf of its thirty-three members.[3] This joint forecast also included,

---

[3]MMWEC's current membership includes thirty municipal light departments in the Massachusetts cities and towns of Ashburnham, Belmont, Boylston, Concord, Danvers, Georgetown, Groton, Hingham, Holden, Holyoke, Hull, Ipswich, Littleton, Mansfield, Marblehead, Merrimac, Middleborough, Middleton, North Attleborough, Paxton, Princeton, Reading, Rowley, Shrewsbury, South Hadley, Sterling, Templeton, Wakefield, West Boylston, and Westfield. At the time of filing the long-range forecast, mu-

at the council's order, individual demand forecasts for each member system. On October 7, 1988, also in accordance with the council's order, MMWEC filed an individual supply plan for each member system. MMWEC reserved its right to contest the council's authority to require MMWEC to file individual member system demand forecasts and supply plans as part of the proceeding. After holding public hearings, the council issued its final decision which approved MMWEC's demand forecast and rejected its supply plan. The council made no specific findings regarding the individual member system demand forecasts and supply plans. The final decision required MMWEC in all future proceedings to submit individual member system demand forecasts and supply plans as part of its joint filing. In this regard the council issued fifteen orders.[4] Pursuant to G. L. c. 164, § 69P (1990 ed.), and

---

nicipal light departments in Chicopee, Hudson, and Peabody were members of MMWEC and were included in the forecast.

[4]The first twelve orders relate to MMWEC's demand forecast, which the council approved, and the last three relate to MMWEC's supply plan, which the council rejected. The orders are as follows:

"The Siting Council ORDERS the Massachusetts Municipal Wholesale Electric Company in its next forecast filing:

"(1)    to (a) examine its residential customer survey methodology to determine methods of increasing response rates in certain systems, and (b) demonstrate that appliance type saturation data used for all systems are representative of appliance ownership decisions of residential customers in those systems.

"(2)    to (a) provide a full explanation of all assumptions made regarding residential appliance type saturation growth rates, and (b) provide a full explanation of the methodology used to forecast miscellaneous appliance type saturations.

"(3)    to fully explain and justify its assumption that miscellaneous appliance type average use consists of six percent of MMWEC's weather-insensitive load.

"(4)    to fully identify the vintages of NEPOOL [New England Power Pool] data which were used to establish MMWEC base year average use estimates.

"(5)    to fully explain and justify (a) MMWEC's procedure for determining which member systems are subject to a significant level of seasonal customer consumption effects, (b) the ability of MMWEC's calibration process to reflect the effects of sea-

G. L. c. 25, § 5 (1990 ed.), MMWEC appealed from the council's decision.

sonal customer consumption on appliance average use estimates, and (c) any adjustments to appliance average use which are designed to reflect the effects of seasonal customer consumption, and which take place following calibration.

"(6)   to present its analysis regarding the validity of the rebound effect. This analysis should be based on major studies and research projects which have addressed the rebound effect and drawn conclusions regarding its validity.

"(7)   to fully reevaluate its use of constant floor-space-per-employee ratios including justification of the use of these ratios with respect to other reasonable methods of commercial floor space growth estimation.

"(8)   to (a) identify additional commercial end uses to be disaggregated, or to fully justify the present level of commercial end-use disaggregation, and (b) fully explain all methodologies used to determine commercial end-use saturations including space cooling saturations.

"(9)   to establish service-territory-specific miscellaneous EUI [energy use indices] growth rates based on non-service-territory specific data.

"(10) to justify any further use of NEPOOL intensiveness trend factors, and to demonstrate that NEPOOL intensiveness trend factors are reasonable predictors of MMWEC's industrial sector consumption characteristics.

"(11) to describe fully and justify its methodology for forecasting municipal, street lighting, and 'other uses' energy requirements.

"(12) to develop and present an analysis of alternative peak load forecasting methodologies, including (a) the ability of alternative peak load methodologies to reflect the major underlying factors of peak load such as weather effects and varying consumption patterns over different months, days, and hours, (b) the level of disaggregation achieved by each alternative methodology, and (c) a time schedule for implementing improvements to MMWEC's peak load forecasting methodology.

"(13) to fully explain and justify the avoided transmission capacity costs assigned to member systems for economic evaluation purposes, including (a) a complete discussion of the methodology used to derive avoided transmission capacity costs, and (b) a full explanation of how transmission capacity cost differences between members were taken into account by the methodology.

MMWEC claims that (1) the council exceeded its statutory authority in ordering MMWEC to file individual member forecasts; (2) the council has no authority to order MMWEC to submit, as part of its next long-range forecast, certain specific data and analyses; (3) the council's finding that MMWEC's electricity price forecast methodology is inappropriate is not supported by substantial evidence; and (4) the council erred in rejecting MMWEC's supply plan.

We address a preliminary matter before turning to these questions. The council argues that its orders are prospective and therefore they presently are not ripe for judicial review. We disagree. First, MMWEC has preserved its right to contest the council's authority to require MMWEC to file individual member forecasts in the *present* filing, which is the subject of this appeal. Second, the council's final decision contained fifteen orders that MMWEC challenges as having no basis in law. Third, we may set aside or modify the council's decision if it is in excess of statutory authority, based on an error of law, arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. G. L. c. 30A, § 14 (7) (*b*), (*c*), and (*g*). (1990 ed.). Therefore, since the orders are part of the decision from which MMWEC is appealing, it is appropriate that we decide their validity at this time by determining the council's authority under its enabling legislation.[5]

2. *Obligations of electric companies under § 69I.* General Laws c. 164, § 69I, provides, in pertinent part: "Every electric company shall, either individually or jointly with others,

---

"(14) to review methodologies which evaluate the economic benefits of C&LM [conservation and load management] options on utility distribution systems, and to report to the Siting Council on the findings of its review.

"(15) to implement a'methodology which includes an adequate consideration of the environmental impacts of resource options."

[5]MMWEC also seeks declaratory relief under the provisions of G. L. c. 231A (1990 ed.). We make no decision as to whether the petition for declaratory relief is properly before us on appeal; however, the issues regarding the legality of the orders raised by the petition are addressed in the context of the appeal.

411 Mass. 183                                189

Massachusetts Municipal Wholesale Electric Co. v. Energy Facilities Siting Council.

file with the council a long-range forecast with respect to the electric power needs and requirements of its market area . . . ."

According to MMWEC, once it submits such a joint forecast as authorized, its statutory obligation is fulfilled and it cannot be required to file individual forecasts. Moreover, MMWEC claims that the council's own regulation, 980 Code Mass. Regs. § 7.01 (5) (c) (1986),[6] accepts the concept of joint forecasts in lieu of individual forecasts. By contrast, the council seeks to make a distinction between filing and review. The council claims that companies participating in joint filings are subject to individual review and that, therefore, separate decisions may be made for each company.

Even if we concede for the purpose of argument that, under its regulation, the council may require individual forecasts, such a requirement would be contrary to the plain language of the statute. General Laws c. 164, § 69I, clearly provides that an electric company can fulfil its statutory obligation by filing either an individual forecast or a joint forecast for "its market area." Since the enabling statute clearly endorses the concept of joint forecasts, any attempt by the council to restrict or to eliminate joint forecasts exceeds the council's legislative mandate and is void. *Simon* v. *State Examiners of Electricians*, 395 Mass. 238, 241 (1985).

The council attempts to distinguish between the filing of a forecast and the review of a forecast. The council urges us to

---

[6]Title 980 Code Mass. Regs. § 7.01 (5) (c) (1986) provides:

"Companies may file joint forecasts or supplements, using the same or comparable methodologies and assumptions. Even so, all historical sales and demand or sendout data and forecast levels must be stated separately for each company whose wholesale and retail sales exceed two percent (2%) of total retail sales in the Commonwealth. Any company whose wholesale and retail sales do not exceed two percent (2%) need not file such data separately if it participates in a joint forecast or supplement. In the event of a joint forecast or supplement, the Council may conduct a joint adjudicatory proceeding concerning the forecasts or supplement. In such a proceeding the Council may render separate and different decisions for different companies."

determine that its legislative mandate of "implementing the energy policies . . . to provide a necessary energy supply for the commonwealth with a minimum impact on the environment at the lowest possible cost," G. L. c. 164, § 69H, requires the council to review individual forecasts as part of a joint forecast. This interpretation flies in the face of the plain language of the statute. The Legislature provided for the alternatives of individual or joint forecasts. It is difficult to postulate why the Legislature would allow electric companies the option of filing a joint forecast and still permit that they be required to file individual forecasts.[7]

A joint forecast necessarily implies an overlapping and sharing of market areas, with perhaps different participants' demand needs being supplied by other participants' facilities while an individual forecast does not. We conclude that MMWEC fulfils its statutory obligation by filing a joint long-range forecast with the council on behalf of its members; that the MMWEC members fulfil their statutory obligation by participating with MMWEC in a jointly filed long-range forecast; and that neither MMWEC nor any of its members must separately state or file "historical sales and demand or sendout data and forecast levels."[8] 980 Code Mass. Regs. § 7.01 (5) (c).

---

[7]The council has stated that it "concurs that a comprehensive review of 30 separate municipal forecasts and supply plans is unnecessary, unwieldy and inefficient." The council thus acknowledges the impracticality of separately reviewing the individual forecasts of the members of MMWEC.

Moreover, MMWEC was established as a public corporation for the purpose of joint action and planning, which is an "essential public function." St. 1975, c. 775, § 2. Allowing the members of MMWEC to file a joint forecast is consistent with MMWEC's function of conducting joint action and planning, and saves the individual members the extra expense of preparing and adjudicating separate reports, which become statistically less accurate when focused on smaller market areas. Requiring individual members to file individual long-range forecasts conflicts with this joint action and planning purpose, and deprives the members of the very benefits that membership in MMWEC affords.

[8]MMWEC's enabling legislation states that G. L. c. 164, §§ 69G-69R, apply to MMWEC "in the same manner and to the same extent as if it were a corporation defined as an 'electric company'" in § 1 of c. 164. St. 1975, c. 775, § 19 (c). Since MMWEC does not sell electric power at

411 Mass. 183                                         191

Massachusetts Municipal Wholesale Electric Co. *v.* Energy Facilities Siting Council.

The council's own regulation is not inconsistent with this interpretation of the statute. As provided in 980 Code Mass. Regs. § 7.01 (5) (c), "all historical sales and demand or sendout data and forecast levels must be *stated* separately for each company whose wholesale and retail sales exceed two percent (2%) of total retail sales in the Commonwealth. Any company whose wholesale and retail sales do not exceed two percent (2%) need not *file* such data separately if it participates in a joint forecast or supplement" (emphasis added).[9]

The council argues that this regulation merely states that certain data need not be filed separately but does not state that such data need not be filed at all. The council claims that, because this regulation allows the council to render separate decisions for different companies participating in a joint forecast, the regulation somehow permits the council to require the specified data separately. The council also interprets the regulation as only preventing the council from ordering MMWEC's members to file separate data in separate and distinct proceedings.

"We interpret a regulation in the same manner as a statute, and according to traditional rules of statutory construction." *Warcewicz* v. *Department of Envtl. Protection*, 410 Mass. 548, 550 (1991). "We ordinarily accord an agency's interpretation of its own regulation considerable deference . . . . However, this principle is deference, not abdication, and courts will not hesitate to overrule agency interpretations when those interpretations are arbitrary, unreasonable, or inconsistent with the plain terms of the regulation itself." (Citation omitted.) *Id.*

---

retail, it has no market area of its own. However, MMWEC's market area could be said to encompass the market areas of all its members. In this regard, with respect to MMWEC, the forecast MMWEC files could be viewed as an individual forecast. With respect to MMWEC members, the forecast could be viewed as a joint forecast.

[9] No individual MMWEC member system has retail sales in excess of the 2% level contained in this regulation.

The regulation states that certain demand data need not be filed separately. While it does not state that such data need not be filed at all, that conclusion is inescapable, in the context of the statute's specific authorization to file individual *or* joint forecasts.[10]

3. *The council's authority to promulgate orders.* The council's enabling legislation states: "There is hereby established the Energy Facilities Siting Council which shall be responsible for implementing the energy policies contained in sections sixty-nine H to sixty-nine R, inclusive, to provide a necessary energy supply for the commonwealth with a minimum impact on the environment at the lowest possible cost." G. L. c. 164, § 69H.[11] General Laws c. 164, § 69I, provides, in pertinent part:

> "Every electric company shall, either individually or jointly with others, file with the council a long-range

---

[10]We make no ruling on the validity of the regulation itself or on the propriety of its requirement for information.

[11]The statute further states, in pertinent part:

> "The council shall have powers and duties as follows:
>
> "(1) To appoint an executive secretary to serve at its pleasure; to prescribe the duties of such other persons as may be required to assist the council in performing its functions, including staff and consultants; and to engage or accept the loan of the services of such persons as may be provided for by appropriation or by authorization from the general court.
>
> "(2) To adopt and publish rules and regulations consistent with the purposes of sections sixty-nine H to section sixty-nine Q, and to amend the same from time to time. This includes the rules and regulations for the conduct of the council's public hearings under the provisions of sections sixty-nine J and sixty-nine M.
>
> "(3) To accept applications for certificates of environmental impact and public need on such forms as it may prescribe, consistent with the provisions of section sixty-nine L; to conduct preliminary investigations thereon and solicit information and recommendations relating thereto; to conduct public hearings in accordance with the provisions of sections sixty-nine M and sixty-nine N and to supervise the enforcement of the terms and conditions of certificates so issued; to issue or deny approvals of long-range plans and notice of intention to construct an oil facility under the provisions of sections sixty-nine I and sixty-nine J."

411 Mass. 183                                                193

Massachusetts Municipal Wholesale Electric Co. v. Energy Facilities Siting Council.

forecast with respect to the electric power needs and requirements of its market area . . . .

"Said forecasts shall include, in such *form* and *detail* as the council shall *prescribe*, the following information:

"(1) A description of all then existing agreements with other electric or gas companies for joint planning or joint forecasting . . . .

"(2) A forecast of the electric power needs or gas requirements for its market area . . . .

"(3) A description of actions planned to be taken by the company which will affect capacity to meet such needs or requirements . . . ." (Emphasis added.)

General Laws c. 164, § 69J, provides, in pertinent part:

"If the council determines the standards set forth above have not been met, it shall within twelve months of the date of filing reject in whole or in part the long-range forecast setting forth in writing its reasons for such rejections, or approve the long-range forecast subject to stated conditions. In the event of rejection or conditioned approval, the applicant or individual company may within six months submit an amended forecast. A public hearing on the amended forecast shall be held on the same terms and conditions applicable to the original forecast."

MMWEC contends that the council's sole function is as a reviewing agency, without the authority to issue orders.

The council claims that it has express power to order electric companies participating in a joint filing to file individual forecasts because the council can "prescribe" the "form" and "detail" of the forecasts. The council also argues that its regulations[12] allow the council to require whatever information

---

[12]The council claims that 980 Code Mass. Regs. §§ 7.01 (5) (g); 7.02 (8) (a); 7.02 (9) (b); and 7.03 (5) (c), authorize it to issue orders. Section 7.01 (5) (g) provides: "The information required by this Chapter shall be

it needs to review a long-range forecast. Additionally, because MMWEC cannot force its members to accept its supply plan, the council contends that MMWEC's forecast does not reflect "actions planned to be taken by the company." See G. L. c. 164, § 69I, second par. (3). Finally, the council argues that MMWEC members would evade review if they are not required to file individual forecasts.

"An agency's powers are shaped by its organic statute taken as a whole and need not necessarily be traced to specific words." *Commonwealth* v. *Cerveny*, 373 Mass. 345, 354 (1977). "Powers granted include those necessarily or reasonably implied." *Grocery Mfrs. of America, Inc.* v. *Department of Pub. Health*, 379 Mass. 70, 75 (1979). "Specific statutory authority to act in a particular respect does not bar consistent action under general statutory authority." *Id.* at 76. However, an administrative agency has no authority to promulgate rules or regulations that conflict with the statutes or exceed the authority conferred by the statutes by which the agency was created. *Simon* v. *State Examiners of Electricians*, 395 Mass. 238, 241 (1985). *Bureau of Old Age Assistance of Natick* v. *Commissioner of Pub. Welfare*, 326 Mass. 121, 124 (1950).

The language of G. L. c. 164, § 69I, permitting the council to prescribe the form and detail of the information included in a forecast does not suggest to us that the council has authority to issue orders. Rather, the section empowers the council to issue guidelines specifying the manner and arrangement of the information (form) and specifying the

submitted in such form as the Council may require." Section 7.02 (8) (a) provides: "The Council may in its discretion require at any time during an adjudicatory hearing subject to 980 CMR 7.00 that a company or other party produce such additional information, data or evidence as the Council needs to render a decision." See note 6, *supra*, for the language of § 7.01 (5) (c). Section 7.02 (9) (b) merely sets out the requirements of the demand or sendout segment of a forecast or supplement.

The council also claims that, since the requirements contained in 980 Code Mass. Regs. § 7.04 refer to "each" electric company, each electric company can be ordered to meet those requirements regardless of whether the filing is made individually or jointly.

small or secondary parts of information (detail) that go to make up the whole. The substance or whole of the information is stated in § 69I itself which requires a description of agreements, a forecast of needs, and a description of actions planned. There is no provision granting the council power to issue orders. Cf. G. L. c. 21E, § 9 (1990 ed.) (expressly grants Commissioner of Department of Environmental Protection power to issue orders); G. L. c. 22, § 4A (1990 ed.) (clearly shows Department of Public Safety can issue orders); G. L. c. 25, § 5 (clearly indicates Department of Public Utilities can issue orders). Nor is there such power implied by the statute which enables the council merely to review and to approve or to reject the forecasts. See *Morey* v. *Martha's Vineyard Comm'n*, 409 Mass. 813, 818 (1991); *Grocery Mfrs. of America, Inc.* v. *Department of Pub. Health*, *supra*.

The council, however, is not required merely to perform a passive review of whatever forecasts are submitted to it. The council can reject in whole or in part or conditionally approve a forecast. G. L. c. 164, § 69J. Although the council cannot order MMWEC to act in a specific way, it can condition its approval on the receipt of additional information or inform MMWEC that it will not approve future filings unless furnished specific information. Assuming that the council's requests of this nature are not arbitrary or beyond the scope of the council's mandate, MMWEC would then be required to submit to the request or have its forecasts disapproved. Without council approval MMWEC cannot commence construction of any new facility to meet the electrical needs of its customers.

There is nothing in the rule-making power of § 69H to the contrary. That section gives the council the express authority "[t]o adopt and publish rules and regulations *consistent with the purposes* of sections sixty-nine H to section sixty-nine Q" (emphasis added). G. L. c. 164, § 69H, fifth par. (2). As we have said, the stated purpose of these sections, §§ 69H-69Q, is to permit the council to review the companies' forecasts and to approve or to reject them.

The council's own regulations recognize this distinction: "The Council may in its discretion require at any time *during an adjudicatory hearing . . .* that a company or other party produce such additional information, data or evidence as the council *needs to render a decision*" (emphasis added). 980 Code. Mass. Regs. § 7.02 (8) (a). This regulation does not purport to authorize the council to require the submission of any additional information beyond the scope of the adjudicatory hearing in progress. We therefore conclude that the council could not issue prospective orders and we strike the fifteen orders as invalid. In reaching this conclusion, we do not determine that, if the orders in question here were issued in the context of an adjudicatory hearing, their issuance would be within the "incidental authority required for the full and efficient exercise of the power conferred." *Scannell v. State Ballot Law Comm'n*, 324 Mass. 494, 501 (1949).

The council's final argument is that, because MMWEC cannot compel its members to implement its joint supply plan, MMWEC's forecast does not reflect "actions planned to be taken by the company." Therefore, the individual member systems would not be fulfilling all statutory obligations and would thereby evade review if they are not required to file individual forecasts. We find this reasoning unpersuasive for several reasons. First, the council cannot compel *any* electric company, let alone an MMWEC member, to implement a supply plan or to construct a municipal electric power facility, even if the company files an individual forecast and the council approves it. Second, no electric company can implement a supply plan or build an electric power facility without the council having first approved a forecast that proposes the supply plan or new facility. Third, the council's function is to review forecasts to determine the need, environmental impact, and cost of supply plans and proposed facilities. Finally, as already discussed, MMWEC members are authorized under § 69I to file joint forecasts. They therefore comply with the law and do not evade review. The council's inability to issue orders does not contravene or frustrate its legislative mandate of implementing the energy policies of the Com-

monwealth. The over-all purpose of the legislation is to establish the council as a reviewing agency to implement the State's energy policies. The council's reviewing power is especially significant concerning the approval of supply plans that contain proposals for new electric power facilities. Nonetheless, we do "not read into a general statement of legislative purpose [in § 69H] any grant of authority outside that clearly and specifically given by the statute." *Daley Constr. Co.* v. *Planning Bd. of Randolph*, 340 Mass. 149, 155 (1959). The council can accomplish its statutory purpose and discharge its official duty without the power to issue orders, a power we have determined that the council does not possess.

4. *The council's decision regarding MMWEC's supply plan.* The council rejected MMWEC's 1988 long-range forecast in part, finding that the supply plan segment did not meet the requirements of G. L. c. 164, §§ 69H and 69J. The supply plan segment of a forecast is a projection of the actions which a company plans to take in order to meet future electric power needs. See G. L. c. 164, § 69I, second par. (3); 980 Code Mass. Regs. § 7.04 (1). A company's supply plan must meet two standards: adequacy[13] and cost.[14] In its final

---

[13]In reviewing the adequacy of a supply plan, the council considers a utility's ability to provide sufficient capacity to meet its peak loads and reserve requirements throughout the forecast period. Adequacy can be established for the short run or for the long run. To establish adequacy in the short run, a company must demonstrate that it has identified a secure and reliable set of energy supplies. If a company cannot establish it has adequate energy supplies in the short run, then it must propose an "action plan" which demonstrates the company has access to alternative supplies in the event of certain contingencies. To establish adequacy in the long run, a company must demonstrate that its planning processes identify and fully evaluate a reasonable range of resource options on a continuing basis that allows a company sufficient time to make appropriate supply decisions to ensure adequate, cost-effective energy and power resources over all forecast years.

[14]In reviewing the cost of a supply plan, the council determines whether the plan minimizes the cost of power (i.e., ensures a least-cost supply) subject to trade-offs with adequacy, diversity, and the environmental impacts of construction and operation of facilities. To establish a least-cost supply, the company identifies resource (supply) options and evaluates the resource options. The company does this by compiling a comprehensive array

decision, the council found that MMWEC's supply plan met the adequacy standard but did not meet the cost standard. The council attributed this failure to shortcomings in MMWEC's resource identification and resource evaluation processes. Specifically, the council found the following: (1) although MMWEC identified an array of generating and nongenerating resource options, MMWEC did not demonstrate that it applied noncost criteria to screen the generating resource options; and (2) that MMWEC did not evaluate the conservation and load management resource (C&LM) options on an "equal footing" with power generation resource options.[15]

MMWEC contends that the council's decision to reject the supply plan is not supported by substantial evidence, is arbitrary or capricious, and is based on an error of law.[16] MMWEC also argues that the council applied a new standard of review in evaluating its supply plan and that the council departed from its approach in other cases.[17]

of generating and nongenerating (conservation and load management programs [C&LM]) resource options and developing and applying appropriate cost and noncost criteria for screening those options. The company must evaluate the resource options on an "equal footing."

[15]The council considers both electric power generation facilities and C&LMs as resources to be used in supply planning. G. L. c. 164, § 69J. Electric power needs are met from the "supply side" (by use of electric power generation facilities) or from the "demand side" (by a reduction of power demand through conservation and load management programs).

[16]MMWEC in its reply brief for the first time argues that adequacy and cost factors are not within the council's purview. MMWEC attempts to explain the council's mandate in § 69H "to provide a necessary energy supply for the commonwealth with a minimum impact on the environment at the lowest possible cost." MMWEC claims that this language does not require the council to consider the cost of electricity. Rather, MMWEC contends it charges the council with minimizing the cost of environmental controls by ensuring those controls are at the lowest possible cost. Since MMWEC never raised this issue with the council, we decline to consider it. We only note that inasmuch as the cost of environmental protection and enhancement increases the cost of electricity, any reduction in cost associated with those features would reduce the cost of electricity.

[17]MMWEC claims that the council's finding that MMWEC's electricity price forecast methodology is inappropriate is not supported by substantial evidence. Since this finding was based on an assumption that members

411 Mass. 183                                               199

Massachusetts Municipal Wholesale Electric Co. *v.* Energy Facilities Siting Council.

We may set aside the council's decision if it is not supported by substantial evidence. See *Fitchburg Gas & Elec. Light Co. v. Department of Pub. Utils.*, 395 Mass. 836, 849 (1985). " 'Substantial evidence' means such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6) (1990 ed.). In reviewing the record, we give "due weight to the experience, technical competence, and specialized knowledge" of the council. G. L. c. 30A, § 14 (7). We also "defer to [the council's] fact-finding role, including its right to draw reasonable inferences from the facts found." *Smith College* v. *Massachusetts Comm'n Against Discrimination*, 376 Mass. 221, 224 (1978). Here the burden is on MMWEC to show that the council's decision is invalid. G. L. c. 25, § 5 (1990 ed.).

MMWEC relied on the testimony of its manager of regulatory services and economic analysis (manager) to describe MMWEC's application of the noncost screening criteria to the generating resource options. The manager stated that "you go through somewhat of a screening process."[18] The

---

would increase the prices they charge consumers in "lock step with resource additions," MMWEC argues that the council's assumption is not supported by substantial evidence. The council, however, approved the demand forecast portion of MMWEC's long-range forecast. The electricity price forecast is part of the demand forecast. The situation before us is not one in which the council has rejected the demand forecast based on its assumption. Because we see no harm caused by the council's assumption or finding, we need not consider this issue.

[18]When the manager was asked to describe how MMWEC systemically applied its screening criteria to municipally owned generation projects, he stated:

> "Well, we could talk about identification as just saying, okay, here's a resource that could in fact be done. There's a much broader issue. There are a variety of sources that are available. Industry literature is full of what different options are. You look at those generation options. It's a fairly large set; but in some ways it's much smaller, as you go through somewhat of a screening process. Some of them are not viable in some aspects, financing by MMWEC, because of the high risks that might be involved in a particular type of technology; or the size, that makes it workable. The ones that were identified here as a generation option in response to that question are those options that were utilized in the development of the base generation

manager's testimony was the only evidence MMWEC offered on this issue. His testimony was general and not supported by any specific information. On review, we believe that a reasonable mind would perceive this evidence as supporting the council's finding that MMWEC had not demonstrated that the noncost screening criteria had been applied to the generating resource options. Furthermore, we do not view the council's rejection of MMWEC's supply plan based on this finding as holding MMWEC to a "rigid supertechnical standard."

MMWEC also argues that the council abandoned its "equal footing" standard by reviewing MMWEC's resource evaluation process in terms of cost, risk, and diversity. Three objectives of MMWEC's supply plan were cost minimization, risk minimization, and diversity. The council used these objectives as the framework for reviewing MMWEC's resource evaluation process. The record shows MMWEC rejected certain C&LM options as too costly while recommending generating options with similar cost characteristics. We therefore conclude that the council correctly determined that MMWEC did not treat C&LM options on equal footing with generating options.

MMWEC's final argument is that the council abused its discretion in finding that MMWEC did not give adequate consideration to C&LM. MMWEC and its consultant, Synergic Resources Corporation (SRC), developed the C&LM options by producing a demand side capacity assessment (DSCA). MMWEC presented the council with much evidence regarding its C&LM options. For example, SRC stated that, although the cost analysis of C&LM options was based on a single set of avoided costs, the economics of the C&LM options were sensitive to costs. SRC therefore recommended that MMWEC evaluate C&LM options with more than one set of avoided costs. The manager stated that MMWEC intends to evaluate C&LM options with more

---

expansion plan; and they were somewhat a result of a screening, if you will, of a larger array of resource options that were identified."

than one set of avoided costs "soon." The council concluded that MMWEC unduly limited the scope of its resource evaluation and questioned whether additional cost-effective C&LM options were excluded. In addition, the DSCA was restricted to an evaluation of twenty C&LM options. SRC indicated that some of the excluded C&LM options may have represented significant C&LM potential for MMWEC and its members. Based on this limited evidence, we determine that the council did not abuse its discretion in finding that MMWEC did not properly consider C&LM options.

5. *Conclusion.* We conclude that the council has no authority under G. L. c. 164, §§ 69G-69R, to issue orders such as are contained in the final decision. Accordingly, we strike those orders. We also conclude that the council's rejection of MMWEC's supply plan is supported by substantial evidence. We therefore affirm that portion of the final decision.

*So ordered.*